# Cook *v.* The State.

## *Murder.*

(Decided June 19, 1912.  59 South. 519.)

1. *Homidie; Conviction of Lesser Offense; Review.*—The Appellate Court will not pass upon the question pertinent to the subject of murder alone, where the verdict was for manslaughter, as that was tantamount to an acquittal of the charge of murder.

2. *Same; Evidence; Character.*—Where the question was as to whether the deceased or defendant was free from fault in bringing on the difficulty, the fact and character of previous difficulties between these parties, but not the particulars thereof, and the general character of the deceased and defendant for peace and quiet, or for turbulence, but not particular acts by which such character was established, may be shown.

.[Cook v. The State.]

3. *Same; Personal Relations.*—Although intimacy between the defendant and the wife of the deceased, and the separation of deceased and his wife, may be shown to disclose the relation of the parties, and a possible motive, it is not competent to show what occurred between the husband and wife before, at the time of, and after the separation.

4. *Same; Questions for Court and Jury.*—Whether or not the defendant made a statement showing that he knew that the deceased objected to his attentions to deceased's wife, and that he intended to continue them in defiance of the wishes of deceased, was a question for the jury rather than the court.

5. *Same; Prior Acts.*—Evidence that on a day previous to the killing defendant was seen with deceased's wife, and made a statement that he was prepared for the deceased at any time, was admissible.

6. *Same; Instructions; Self Defense.*—Where the evidence tended to show that the defendant provoked the difficulty by his attentions to the wife of the deceased, in which the deceased was killed, a charge as to the right of defendant to defend himself, where it did not predicate such right upon defendant's freedom from the commission of any intentional act tending to provoke the difficulty, was erroneous.

7. *Same.*—A charge on self defense which ignores evidence that defendant pursued deceased while he was in retreat, and shot him, and that he also shot him while he was down and helpless, was properly refused.

8. *Same.*—Charges on self defense which ignore duty to retreat or the doctrine of retreat are properly refused.

9. *Same; Cooling Time; Evidence.*—Where the evidence showed that the difficulty in which deceased was killed was of short duration and that the shooting was rapid and practically continuous from the inception of the difficulty until its conclusion, a charge on cooling time was abstract and properly refused.

10. *Same; Conformity to Evidence.*—A charge asserting that if the deceased made a felonious attack upon the defendant, and defendant could not safely retreat, he would then be under no duty to retreat, but could stand his ground, was properly refused, where there was evidence tending to show that defendant had provoked the difficulty by his attentions to deceased's wife.

11. *Appeal and Error; Presumptions; Review.*—There is presumption on appeal that the trial was legally and properly conducted, and it is upon appellant to overcome such presumption.

12. *Evidence; Mental Status.*—Evidence as to a mere uncommunicated expectation or mental status of a witness is irrelevant, and improper.

13. *Same; Character.*—While a defendant may show his good character he may not show that he possesses a character superior to that of the average man, and hence, defendant may not show that his character was better than that of the average negro.

14. *Charge of Court; Covered by Those Given.*—It is not error to refuse instructions substantially · covered by written instructions given.

[Cook v. The State.]

15. *Witnesses; Examination; Repetition.*—Where a witness had testified that he did not know that a fuss was about to be started when he left the church, it was not error to refuse to permit him to answer whether or not he was expecting trouble.

APPEAL from Greene Circuit Court.     .

Heard before Hon. S. L. BREWER.

James Cook, alias, etc., was convicted of manslaughter, and appeals. Affirmed.

The facts sufficiently appear in the opinion of the court. The following charges were refused to the defendant: R. "The court charges the jury that if they believe from the evidence that Jack Powell commenced the difficulty by throwing a rock at the defendant, and followed this up by reaching for his pistol, and that the defendant retreated until he was stopped by a buggy, and that if you believe that such facts, together with the position in which he found himself then placed, were such as to impress him with the impending danger of his life, or great bodily harm, then, under such facts, he had a right to shoot Jack Powell and to shoot to kill." L. "The court charges the jury that if an attack was made by the deceased upon the defendant that was manifestly felonious, and that the defendant could not safely retreat, then the defendant was under no duty to retreat, but could stand his ground." (25) "The court charges the jury that if they believe from the evidence that the deceased attacked defendant by throwing a piece of slag at him, and followed this up by shooting at him with a pistol, when the defendant had not molested deceased, then not only does the defendant have the right to resist the deceased, by shooting him, but any person present had a right to come to the aid of the defendant in resisting such attack made upon him by the deceased." (13) "One may be acting in self-defense, and yet have a formed design to take life." (32) "The court charges the jury that cooling time in

the law of homicide is defined as time in which passion
would have subsided unless wrath had been nursed."

McKinley, McQueen, Hawkins & Snow, for appel-
lant. The lower court erred in sustaining the objection
of the State to the following question propounded by
the defendant on cross examination of the witness
Charley Powell: "So you were expecting some trouble
then?"—*Mattison v. State,* 55 Ala. 224 (232); *Storey
v. State,* 71 Ala. 329; *Gafford v. State,* 122 Ala. 54. The
lower court erred in refusing to permit the defendant to
show that the deceased had repudiated his wife and had
taken another woman into his house to live with him as
his concubine.—*Mattison v. State,* 55 Ala. 224; *Williams
v. State,* 103 Ala. 33. The lower court erred in sus-
taining the objections of the State to the questions pro-
pounded by the defendant to the witness J. G. Harris,
as to whether or not the general reputation of the de-
fendant was better than that of the average negro.—
*Crawford v. State,* 112 Ala. 21. The lower court erred
in overruling defendant's objections to the following
questions propounded by the State to the witness Char-
lotte Neal: "Had you on the Tuesday before that day
seen Jeems, the defendant, and Bell Powell, wife of
deceased, together?" and in overruling the defendant's
motion to exclude from the jury the answer of said
witness to said question.—*Rogers v. State,* 117 Ala. 9
(14); *Robinson v. State,* 108 Ala. 14. The lower court
erred in overruling the appellant's objection to the fol-
lowing question propounded by the State to the witness
Charlotte Neal: "Who was with him," and in over-
ruling appellant's motion to exclude from the jury the
answer of the said witness to the said question.—*Rogers
v. State,* 117 Ala. 9 (14); *Robinson v. State,* 108 Ala.
14. The lower court erred in refusing to give written

charges "R," requested by the appellant.—*Storey v. State*, 71 Ala. 329. The lower court erred in refusing to give written charge "L," which was requested by the appellant.—*Storey v. State*, 71 Ala. 329. The lower court erred in refusing to give written charge number 25 which was requested by the appellant.—*Storey v. State*, 71 Ala. 329; *Bostic v. State*, 94 Ala. 45; *Suell v. Berricott*, 161 Ala. 259. The lower court erred in refusing to give written charge number 13 requested by the appellant.—*Poe v. State*, 155 Ala. 31 (38) ; *Karr v. State*, 106 Ala. 1. The lower court erred in refusing to give written charge No. 22, requested by the appellant.—*Fields v. State*, 52 Ala. 348 (354).

R. C. BRICKELL, Attorney General, and W. L. MARTIN, Assistant Attorney General, for the State.

DE GRAFFENRIED, J.—The defendant was regularly indicted for murder, was tried by a jury, convicted of manslaughter in the first degree, and from the judgment of the trial court pronounced upon the verdict appeals.

The homicide was committed in a negro churchyard near the Alabama Great Southern Railway, about three miles west of Eutaw, in Greene county. The day of the homicide had been set aside by the church authorities for the observance of the ceremonial known as "foot-washing," and the ceremonies attendant upon this religious rite appear to have attracted to the church, on this occasion, a large number of colored people, many of whom did not belong to the church referred to. A family by the name of Powell lived three or four miles from this church, and, while they were members of a different religious denomination, this family, consisting of Charlie Powell, the father, Jack Powell (the deceased), Morris Powell, William Powell, Mann

Powell, and Ezra Powell, and certain women, all children of said Charlie Powell, were present on that day. The defendant, James Cook, also known as "Black James Cook, Jr.," Gus Cook, and "Yellow James Cook," who appear to have been members of the same family, were also present. The homicide was committed about 4 o'clock in the afternoon at a time when many people were present, and there appear to have been many witnesses to the homicide. Shortly before the commencement of the difficulty the exercises in the churches had been concluded, and at the time of the difficulty some of the members of the congregation—including Charlie Powell, the father, and the female members of his household—had left for their respective homes, and those remaining on the grounds were making preparations to do so.

The deceased had a wife, Bell Powell, from whom he had separated a few months previously, and when the difficulty which resulted in the homicide was commenced Bell Powell was standing near the church in conversation with the defendant. She came to the church on that day in a buggy with the defendant, who, as events proved, was armed. The above-named "Yellow James" Cook and Gus Cook also appear to have been armed, and the same is certainly true with reference to the deceased and his brother John Powell. It appears from this record that a few days before the homicide the defendant was seen with the wife of the deceased, and that he said on that day "that he was prepared for Jack Powell, the deceased, at any time." An offer was made on the part of the defendant to show by evidence that the deceased, several months before the homicide, had driven his wife, Bell Powell, from his home, and had notified her that he no longer laid any claims upon her, and that, in her stead, he

[Cook v. The State.]

had taken into his home a female companion who, at the time of his death, was living with him as his mistress. The defendant, when Bell Powell was on the stand as a witness in his behalf, was, by indirection, able to get before the jury some testimony on the above subject, for, in detailing a conversation with the deceased which this witness claims to have had with him immediately before the homicide, she said she told deceased that it was none of his business with whom she came to the church, "as he had told her to go with whom she damned pleased"; that in "this conversation between the witness and Jack Powell she reminded him that he had told her that he was going to put another woman in his house and that she could go with whom she damned pleased." We are, however, for reasons hereafter given, of the opinion that the trial court was free from error, under the circumstances of this case, in excluding the direct evidence on the above subject which the defendant offered to introduce before the jury.

As we have already said, the defendant was standing near the church and near his buggy talking to Bell Powell when the difficulty was commenced. The deceased committed the first overt act, for he threw a rock in the direction of the defendant. Whether he threw the rock at the defendant or at Bell Powell we do not know; but we will treat this case as if there were no doubt about the fact that the rock was thrown at the defendant.

Immediately after the rock was thrown, there was one—possibly two—pistol shots. The state's evidence tends to show that the defendant, when the rock was thrown, quickly drew his pistol and shot at the deceased. Some of the evidence tends to show that there were two pistol shots at the same time, one by the de-

2 CA

ceased at the defendant and the other by the defendant at the deceased. There was also some evidence that when the rock was thrown the defendant backed or retreated to his buggy, and that he did not draw or shoot at the deceased until after the deceased had drawn his pistol and shot at him. The evidence further tended to show that "Yellow James" Cook and Gus Cook also drew their pistols and fired several shots at the deceased. The evidence further tended to show that John Powell, a brother of the deceased, took a hand in the difficulty and shot several times at the defendant. All of the evidence showed that the deceased, when the defendant began to shoot at him, retreated to a wire fence, and that while he was thus in retreat the defendant followed him, continuing to shoot him, until he reached the wire fence, were he fell and at once expired. There was evidence tending to show that while the deceased was thus retreating he was shooting at the defendant, and that while the defendant was following the deceased and shooting at him, John Powell was following the defendant and shooting at him. In other words, the defendant claimed that, at the time he killed the deceased, he (the defendant) was being shot at by John Powell, and that, in retreating from John Powell, he was forced to advance upon deceased, who was in front of him, and that, as deceased continued to shoot at him, he was, for his own protection, forced to shoot at the deceased. There was some evidence tending to sustain this theory, for there was evidence that, when the defendant reached the wire fence at the point where the deceased fell, he passed the deceased and continued traveling in the same direction with John Powell following behind and shooting at him until he reached a house, in which he took refuge. The state's evidence on the subject is best expressed in the language of a

witness who testified that "he heard the shooting and looked and saw four or five negroes running towards the north; that one was in front and the other four were running after him; that the one running from the others had his back turned to them; that the witness saw the shooting as this party left the front of the church, and the other three or four men behind the one began to shoot at him; that the man in front ran on towards the wire fence and the other three or four continued to follow him shooting him; that when the party first got to the wire he made some effort to get over it, and fell; * * * that when he fell the parties who were pursuing him ran in and made two shots at him; that the strand of wire was 60 or 80 feet from the church."

The deceased had five bullet wounds in his body; one in the middle of the breast, one midway between the shoulder and elbow in the left arm, one through the muscle of the right arm, one in the right side, and one in the back. All of the wounds went straight in. The wound in the left arm entered from behind, and all of the wounds were not made with the same pistol; some of the wounds being larger than the others.

The testimony in this case—and there were many witnesses—is conflicting in many material ways. The above-quoted evidence for the state was contradicted in many of its material points, as the defendant's evidence tended to show that no one shot the deceased after he fell.

The defendant was charged with murder, but was convicted of manslaughter in the first degree. We are therefore relieved of the necessity of passing upon any question presented by this record—either in the rulings of the court on the admission or the rejection of evidence or in giving or in refusing to give charges to the

jury—which is pertinent only to the subject of murder in either of its degrees.—*Allen v. State,* 148 Ala. 588, 42 South. 1006; *Laws v. State,* 144 Ala. 118, 42 South. 40.

The conviction of the defendant of manslaughter in the first degree acquits him of murder in either of its degrees *(Ferguson v. State,* 141 Ala. 27, 37 South. 448), and we therefore have, as referable to the facts of this case, a verdict which declares that the homicide was the result of sudden passion upon provocation at the hands of the deceased amounting at the least to an assault, and that, while the homicide was unlawful, it was without malice, either express or implied.—*Brewer v. State,* 160 Ala. 66, 49 South. 336; *McBryde v. State,* 156 Ala. 44, 47 South, 302; *Laws v. State,* 144 Ala. 118, 42 South. 40; *Logan v. State,* 155 Ala. 85, 46 South. 480.

The state's theory was that the defendant, Gus Cook, and "Yellow James" Cook had entered into a conspiracy to kill the deceased, that the homicide was the culmination of the conspiracy, and that under the facts there was murder. The theory of the defendant was that the deceased and his brothers had entered into a conspiracy to kill him, that the difficulty was provoked by the defendant in furtherance of *that* conspiracy, that the defendant did nothing to provoke the difficulty, that all the shots fired by him were necessarily fired to protect himself from death or great bodily harm at the hands of the deceased and one of his co-conspirators, John Powell, and that therefore he was entitled to an acquittal. The verdict of the jury has, so far as the questions presented by this appeal are concerned, exploded both theories, and this record presents to us for our consideration only such questions as we could properly review had the indictment charged the defendant with manslaughter in the first degree, and not with murder. Authorities supra.

On appeals the burden is in all cases upon him who seeks the reversal of a judgment to show that the trial court committed error. The repose and security of society require courts exercising appellate jurisdiction to sustain the judgments brought before them for review unless the appellant successfully meets the above burden and overcomes the presumption, in a legal way, that the trial in the nisi prius court was legally and properly conducted.—*Gafford's Case*, 122 Ala. 54, 25 South. 10.

2. There was no error in the court's refusal to allow the witness Charles Powell, while the defendant was cross-examining him, to answer the following question, "So you were expecting some trouble, then?" Immediately preceding the above question, the witness, in answer to a question of the defendant, had testified that "the witness was standing in the road in front of the church just before he left for home, and that Jack Powell *got up and walked up to the witness and spoke to him,* but that the witness did not have anything to say to John Powell; that the witness did not know when John Powell's wife left the church, as he did not see her when she left; that the witness did not know anything about any fuss at the church until it was all over with; *and that he did not know that a fuss was about to be started when he left the church."* As the witness had already answered the above question when it was asked, the court was without error in not requiring the witness to repeat his answer. Besides, the mere uncommunicated expectations or mental status of the witness were irrelevant.—6 Mayfield's Dig. p. 349, § 9.

3. The only possible theory upon which evidence tending to show that the deceased, after he had repudiated his wife, had put up the bars around his home against her re-entrance and had supplied her place with

a concubine, is that such testimony might have tended to show that the defendant was free from fault in bringing on the difficulty; in other words, that Bell Powell, so far as the deceased was concerned, was open to the attentions of the defendant, and that the deceased had no right to complain of any such attentions. Undoubtedly there was bad feeling existing between the deceased and the defendant at the time of the homicide, and this bad feeling was due, we feel confident, to the defendant's attentions to the wife of the deceased. Courts must, however, confine the testimony in a case to its real issues. Inquiries into the particulars of collateral matters should never be permitted unless they clearly tend to shed material light upon the real issues in the case. When the question as to whether the deceased or the defendant, in a trial for unlawful homicide, was free from fault in bringing on the fatal difficulty, is in doubt, the fact and character of previous difficulties—but not their particulars—between the defendant and the deceased may be shown. Under such circumstances, previous threats and their character—but not the particulars of the causes of the threats—may also be shown. In such a case the general character of the deceased and the defendant for peace and quiet or for turbulence and for bloodthirstiness—but not the particular acts by which such character was established—may also be shown.

In the case of *Gafford v. State,* 122 Ala. 54, 25 South. 10, the Supreme Court held that, as there was a conflict in the evidence on the question as to who was at fault in provoking the fatal difficulty, the fact that the *deceased* was *intimate* with the defendant's sister might have shed light on the question as to whether the *deceased* had a motive for killing the defendant, and that therefore evidence tending to show *that fact* was com-

[Cook v. The State.]

petent. Certainly if the deceased voluntarily put away his wife—unless, indeed, his doing so grew out of the attentions of the defendant to her—put up "the bars" against her return to his home, told her that she could go with whom she damned pleased, and placed in his home a concubine in her stead, the legitimate tendency of these facts, if true, would have been to rebut the idea that the *deceased* entertained animosity against the defendant on *her* account or that he objected to the defendant's attentions to her. The mere fact, without more, that the defendant drove the deceased's wife to church on that day, gave the deceased no legal right to attack the defendant or to provoke a difficulty with him, and it in no way affected the defendant's legal right of self-defense if the deceased did in fact attack him on that account. The mere fact, without more, that the defendant was talking—as all of the evidence discloses —to the wife of the deceased at the time of the commencement of the difficulty gave the deceased no legal right to attack the defendant or in any way preclude the defendant from his legal right to repel that attack. The *fact* of the intimacy of the defendant with the wife of deceased—and therefore circumstances tending to show that fact—may have been relevant on the question as to whether the deceased and the defendant were on good or bad terms and as to whether the deceased or the defendant had a *motive* for killing the other.—Underhill on Criminal Evidence, § 90, p. 167. As tending to shed light on that question, the *fact* that the defendant and his wife had separated may also have been relevant; but what occurred between the husband and the wife before, at the time of, and after the separation was entirely irrevelant. If the court had permitted evidence as to these matters, the inquiry would have been deflected from the question of guilt vel non of the

defendant of the offense for which he was on trial and converted into an entirely separate and distinct investigation. The question was not whether the deceased was guilty of vagrancy for abandoning and refusing to support his wife, or whether he or she was entitled to divorce, but whether the defendant was excusable under the law for taking the life of the deceased. It is not claimed that the deceased had ever given to the defendant his consent to devote himself to his wife or to live in adultery with her, and the defendant had no concern in the causes which led up to the separation or in the domestic quarrels between the husband and the wife. She was his lawful wife, and, so far as the defendant was concerned, these matters were res inter alios acta.

4. For the reasons above stated, we think that the court was free from error in permitting evidence to go to the jury tending to show that the defendant was seen with the deceased's wife on Tuesday before the homicide, and that he brought her to church on the morning of the homicide. There was evidence tending to show that the defendant knew that the deceased objected to his attentions to his wife. On the above Tuesday there was evidence tending to show that the defendant said that "he was prepared for Jack Powell, the deceased, at any time."—*Gafford v. State, supra.*

If the defendant made that statement—and the jury and not the court was the forum to pass upon that question—then there was evidence before the jury tending to show that the defendant, when seen with the wife of deceased on Tuesday before the homicide, *knew* that the deceased objected to his attentions to his wife, and that the defendant was attending upon her in *defiance* of the wishes of the deceased.

In the case of *Robinson v. State,* 108 Ala. 14, 18 South. 732, the paramour was killed by the brother of the mistress. The paramour, who is not shown to have made any threats against the life of the defendant, had on his person at the time of his death a note written to him by the mistress, of the existence and contents of which the defendant knew nothing at the time of the homicide. The defendant offered the note, which tended to establish the adulterous relations, in evidence, and the Supreme Court held that it was not admissible for the purpose of explaining the defendant's conduct on the occasion of the homicide. As the defendant knew nothing of the existence of the note, its existence and contents could not have affected his actions on that occasion. In the above case the Supreme Court does not seem to have considered the question as to whether the note and its contents were not admissible as tending to explain the actions of the deceased at the time of the homicide. It may be that if the deceased had the note in his possession at the time of his death, as the defendant claimed in that case, that circumstance, taken in connection with the contents of the note, might have shed light on the question as to whether the deceased— the alleged *paramour*—did not have a motive for killing the defendant, and therefore a motive for provoking a difficulty with him.—Underhill on Criminal Evidence, supra; *Gafford v. State, supra.*

What we have above said applies also to the case of *Rogers v. State,* 117 Ala. 9, 22 South. 666; except that in the *Rogers Case* the only evidence tending to show that the defendant was not guilty of murder was the evidence of the defendant, and his testimony tended to show a justifiable homicide. The Supreme Court, however, in the case of *Gafford v. State, supra,* which is later in point of time than the case last cited, expressly

holds that on a trial under an indictment for murder, where the evidence is in conflict as to who was the aggressor in the fatal encounter, evidence of the existence of adulterous relations between the deceased and a sister of the defendant is admissible as tending to show a motive on the part of the deceased for bringing on a difficulty with the defendant.

In the instant case the *defendant knew* of his attentions to the wife of the deceased on the Tuesday previous to the homicide, and if he made the above-quoted threat the wisdom of the holding in the case of *Gafford v. State* is apparent. The deceased may not have been influenced by what the defendant did on that Tuesday, but the defendant may have had that Tuesday in mind when the fatal difficulty was precipitated.

5. Charge R is faulty as applied to the evidence in this case. There must have been freedom from fault on the part of the defendant in provoking the fatal difficulty for him to have successfully invoked the doctrine of self-defense. This the charge altogether ignores. There was testimony tending to show that the deceased objected to the defendant's attentions to his wife; that the defendant not only knew of this fact, but was prepared for the deceased, and was, in the presence of the deceased, openly and knowingly paying attention to the wife of the deceased at the time of the commencement of the difficulty. The deceased and his wife may not have been living together at the time of the homicide, but the woman was nevertheless the wife of the deceased. He owed to her certain marital duties which, under the law, at the time of the fatal difficulty, she had the right to enforce against him. If the defendant knew that the deceased objected to his attentions to his wife—and the threat, if he made it, of the Tuesday before, tended to show that he not only did know it, but

intended to persist in them to the death—then, when the defendant openly, in front of the church and near his buggy, in the presence of the deceased, became attentive to the wife and indicated a purpose to take her home, it was for the jury to say whether the defendant did not intentionally do an act tending to provoke, and thereby intending to provoke, a difficulty with the deceased.

There was evidence tending to show that the defendant pursued the deceased, that he shot the deceased while the deceased was in retreat, and that he also shot him while he was down and helpless to defend himself. This feature of the evidence the charge also ignores, and was therefore misleading in its tendency.

6. In East's "Pleas of the Crown" we find the following: "A man may repel force by force in defense of his person, habitation, or property against one who manifestly intends, or endeavors, by *violence* or *surprise,* to commit a known felony, such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases he is *not obliged to retreat,* but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing, it is called *justifiable self-defense.*"—1 East, P. C. 271.

During the formative period of the common law, every male citizen, as a rule, went armed. The gentleman carried his sword; and the yeoman his pike. As deadly weapons were therefore usually at hand, the law required that in chance medley—a casual or sudden affray, or an affray in the heat of blood—the slayer of his adversary, to be excusable in the eye of the law, must have retreated "to the wall" or so far as he could without increasing his peril. "Wherefore to *excuse* homicide (in cases of chance medley) it must appear that the slayer had no other possible (or, at least prob-

able) means of escaping from his assailant."—4 Black. Com. 184.

In the case of *Storey v. State,* 71 Ala. 337, we find the following language used by Mr. Justice Somerville: "When, however, the assault is *manifestly felonious in its purpose and forcible in its nature,* as in murder, rape, robbery, burglary, and the like, as distinguished from secret felonies, like mere larceny from the person or the picking of one's pocket, the party attacked is under no obligation to retreat. But he may, if necessary, stand his ground and kill his adversary." At common law all forcible felonies were punishable by death, and says Mr. Blackstone: "The law of England, like that of every other well-regulated community, is too tender of the public peace, too careful of the lives of the subjects, to suffer with impunity any crime to be prevented by *death,* unless the same, if committed, *would* (not might) also be punished by death. In instances of *justifiable* homicide, it may be observed that the slayer *is in no kind of fault whatsoever, not even in the minutest degree;* and is therefore to be totally acquitted and discharged with *commendation* rather than *blame.*" A high degree of proof, therefore, must be adduced by him who successfully invokes the doctrine of justifiable self-defense, and any charge, when there is evidence tending to sustain such theory, is faulty which does not predicate the defendant's freedom from fault in provoking the difficulty if the homicide resulted in the resistance of a murderous assault. Otherwise a sudden, murderous assault might be provoked for the purpose of committing murder.

Charge L is faulty in that it fails to predicate the defendant's freedom from *all fault* in provoking the difficulty, and, as applied to the facts of this case, was abstract. The evidence does not disclose—and its ten-

dencies do not disclose—that the defendant, even if in a position to invoke the doctrine of self-defense in *excusable homicide,* occupied in this difficulty that high degree of freedom from fault, *"not even in the minutest degree,"* which is an indispensable element of *justifiable* homicide. We do not think that the paramour of a man's wife—and there was some evidence from which the jury had the right to infer that the defendant occupied that relation to the wife of the deceased—when seen in a public place flaunting his attentions to the wife in the face of the husband, can, although the husband and wife may be living apart, occupy that high plane of freedom from fault in provoking the difficulty if he is then and there attacked by the husband even with the intent to murder which will enable him to successfully invoke the doctrine of justifiable self-defense.—4 Black. Cob. supra; *Storey's Case, supra.*

The doctrine of justifiable—as opposed to excusable —homicide was developed by the common-law judges not so much as a doctrine of self-defense as one for the prevention of forcible felonies, which, as above stated, were all punishable by *death,* and by *death only.* A sheriff, when he, under the mandate of the law, executes a criminal, commits justifiable homicide, for he is the *law's executioner.* And so, at common law, a citizen, to prevent a forcible felony—one punishable by death— upon his own person or property or upon the person or property of another, was justified by the law, without retreat, in killing the would-be felon, not so much to save his own life as to prevent the commission of the felony. He was, in such a case, permitted to become, in fact, the law's executioner, and to do so the law required that he be free from all fault in producing the necessity to kill.

The best, under all the evidence and all of the tendencies of the evidence in this case, that the defendant could claim, was that the homicide that he had committed was *excusable*. In a case of *justifiable* homicide the very name whereof imports some fault, some error, or omission, so trivial however that the law excuses it from the guilt of felony."—4 Black. Com. 183.

Charge L, requested in writing by the defendant, was, for the reasons above stated, properly refused.

7. We do not think that charge 25 predicates that freedom from fault in provoking a fatal difficulty which the law exacts of a defendant when he invokes the doctrine of self-defense. It is certainly bad because it ignores the doctrine of retreat, and it was for that reason, as well as for others which, in the light of what we have already said, will suggest themselves, properly refused by the court.

8. Charge 13, requesting in writing by the defendant, was also properly refused. It was covered by charge No. 10, which was given to the jury at the written request of the defendant.

9. The facts in this case show that the fatal difficulty was of short duration. It is evident that the shooting was rapid and practically continuous from the inception of the difficulty until its conclusion. The question as to what is or what is not "cooling time" could not have arisen on the trial in the court below, and, as referable to the facts of this case, charge 32 requested in writing by the defendant was properly refused.

10. The law says that, when a defendant is placed upon trial under a criminal charge, he may offer evidence as to his good character. The reasons why the law permits this testimony are well known and need not be stated here. The elements necessary to good character are also well known. Presumptively the "aver-

[Cook v. The State.]

age man" possesses those elements of good character, for good character is presumed until the contrary is shown. We know of no rule, however, which permits a defendant to show by witnesses that he—after the similitude of the Pharisee who was thankful that he was better than other men—possesses a character superior in points of excellence to that of the average man. The witness Harris was properly permitted to testify that the defendant was, in the community in which he lived, regarded as a man of good character. The court properly refused, however, to allow that witness to testify that his character was better than "the average negro." The law draws no distinction between the negro and the members of the white race as to what is or what is not a good character. There is but one standard, and all men must measure up to it.

11. We have carefully considered this record, and all the questions presented by it. We have discussed in the above opinion only the questions which have been discussed by counsel for appellant in their brief, and counsel in their briefs have discussed the only questions presented by the record which possess the appearance of merit. We do not deem it necessary to further lengthen this opinion. We are convinced by the record that in the trial of the defendant the court below committed no error for which its judgment should be reversd.

The judgment of the court below is affirmed.

Affirmed.