## ROBERSON v. STATE.

No. A-10978. May 3, 1950.

(218 P. 2d 414.)

Frank Nesbitt, Miami, and Nelle Nesbitt, Miami, L. Keith Smith, Jay, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J. The plaintiff in error, Jake Roberson, defendant below, was charged by information in the district court of Ottawa county, Okla., with the murder of Ben (Doc) Wilson. It was alleged in the information he shot and killed Wilson with a .38 caliber pistol in the Blue Goose Cafe in the town of Fairland, Ottawa county, Okla., on February 22, 1947.

It will not be necessary to detail the facts in connection with the killing notwithstanding the fact that the defendant makes numerous assignments of error as grounds for reversal of the judgment and sentence herein imposed. However, it is essential that we call attention to the fact that the plea of self-defense was supported by substantial evidence. The defendant testified that the deceased was armed with a pistol and fired at him. Defendant's son testified Wilson fired at defendant two or three times. In this he was supported by the testimony of a reputable doctor, who said that Roberson had been twice nicked in the back of the neck by bullets or fragments thereof. Moreover, there was evidence to the effect that after decedent fired his shot or shots the defendant drew his gun and fired two shots, and that the decedent then dropped his gun on the floor and lunged headlong into the defendant. When the killing was over there was evidence offered by the defendant that when the body of Doc Wilson was turned over a nickel plated pistol allegedly used by Wilson was found under him. Further detailing of the evidence is we deem unnecessary.

To determine the issues herein involved it will be necessary only to consider the two assignments urged in the defendant's brief. Therein he first contends the verdict of the jury is the result of passion and prejudice created and developed by the introduction of highly prejudicial, incompetent and improper evidence, to all of which the defendant objected and excepted at the time of introduction, and at the close of all the evidence moved the court to withdraw the same from consideration of the jury, and being overruled, did except.

It clearly appears that the defendant attacked the character and reputation of the deceased, to the effect that the deceased Wilson had a bad reputation as being a violent and turbulent person. Evidence was offered by the defendant for that purpose. Before offering evidence as to Wilson being a violent and turbulent person, the defendant had laid the proper predicate by showing that he had acted in self-defense in shooting Wilson. Under the authorities in this state, this procedure was permissible. In Murphy v. State, 72 Okla. Cr. 1, 112 P. 2d 438, 443, it was said:

"On a trial for murder where defendant has laid a proper foundation by evidence tending to show that, in committing the homicide he acted in self-defense, he may introduce evidence of the turbulent and dangerous character or reputation of deceased.

"On a trial for murder where the defense is justifiable homicide in self-defense, and there is evidence to support the same, evidence of specific acts of violence on the part of deceased against persons other than defendant, being known to defendant prior to the homicide, is admissible for the purpose of showing the disposition of deceased to become violent without provocation, and as tending to show his condition of mind and violent temper on such occasions and his disposition to use deadly weapons."

In support of the foregoing rule announced in Murphy v. State, supra, this court cited 64 A.L.R. 1029, and Annotation 121 A.L.R. 380; Sneed v. Territory, 16 Okla. 641, 86 P. 70, 8 Ann. Cas. 354; Mulkey v. State, 5 Okla. Cr. 75, 113 P. 532; Mathews v. State, 16 Okla. Cr. 466, 184 P. 468; Elliott v. State, 18 Okla. Cr. 230, 194 P. 267; Edwards v. State, 58 Okla. Cr. 15, 48 P. 2d 1087. In Ammons v. State, 28 Okla. Cr. 433, 231 P. 326, it was said:

"Where the issue of self-defense is raised and there is some evidence to support it, it is error to exclude evidence that the prosecuting witness, prior to and at the time of the difficulty, had the general reputation of being a violent, quarrelsome, and turbulent man, and that such general reputation was known to the defendant."

See, also, Jenkins v. State, 80 Okla. Cr. 328, 161 P. 2d 90, 162 P. 2d 336; In re Fraley, 4 Okla. Cr. 91, 111 P. 662. In light of the foregoing authorities, the defendant having laid the proper foundation by evidence establishing his plea of self-defense, it was then permissible for him to attack the character of the decedent for turbulence and violence. It would have been error to have denied the defendant the right so to do under the conditions herein presented.

It is conceded by the Attorney General that at no time did the defendant offer any proof as to his own good character and reputation in any regard. He remained silent in relation thereto, even on the point of being quiet and peaceable. The Attorney General concedes in his answer brief that under the law where the defendant has not made an issue of his reputation in a homicide case, prompted by the almost universal agreement of the courts the state may not attack the same. This concession was to the effect that the state is not entitled to introduce

evidence of the bad character or reputation of accused unless he clearly and expressly puts his character in issue by introducing evidence of good character. In this connection, see 22 C.J.S., Criminal Law, § 676, page 1069, Note 20, and the numerous authorities therein cited, as well as the consistent holdings to that effect by this court. Flynn v. State, 68 Okla. Cr. 72, 96 P. 2d 96, this court said:

"It is a fundamental principle of criminal law that the character of the defendant cannot be impeached or attacked by the state, unless he puts his character in issue by introducing evidence of good character."

In the body of the opinion 68 Okla. Cr. at page 85, 96 P. 2d at page 102 it was said:

"In Jones v. State, 20 Okla. Cr. 154, 172, 201 P. 664, 670, this court in the body of the opinion stated:

" 'It is not admissible to show the bad character of the defendant until after the defendant himself puts his good character in issue, and then only by showing his general reputation, and not by particular acts. Evidence of other criminal acts not in issue in the case should be excluded; such testimony has a tendency to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the charge at issue, or to take proof of it as justifying the defendant's condemnation, irrespective of his guilt of the crime for which he is being tried. Moreover, the use of alleged particular acts, ranging over the entire period of the defendant's life, makes it impossible for him to prepare to refute the charges, any or all of which may be mere fabrications. The rule as above stated has received the judicial sanction of the courts of this country for more than a century. Underhill on Evidence, § 82; 1 Wigmore on Evidence, 233; 10 R.C.L. 953; Porter v. State, 8 Okla. Cr. 64, 126 P. 699; Corliss v. State, 12 Okla. Cr. 526, 159 P. 1015.'

"In Porter v. State, 8 Okla. Cr. 64, 126 P. 699, this court said in the first syllabus:

" 'Where the character or reputation of the accused is not an element of the crime charged, the prosecution cannot put it in issue by offering evidence of his bad character, unless the defendant first offers evidence of his good character. The prosecution may then rebut it by evidence of bad character.' "

As observed in Jones v. State, supra, such attack is limited to the defendant's general reputation. In Lizar v. State, 74 Okla. Cr. 368, 126 P. 2d 552, 553, this court said:

"The character of the defendant cannot be impeached or attacked by the state, unless he puts his character in issue by introducing evidence of good character."

See, also, Smith v. State, 75 Okla. Cr. 55, 128 P. 2d 250; Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809. In Duggins v. State, 76 Okla. Cr. 168, 135 P. 2d 347, 351, wherein the court said:

"There are two other errors shown in the record which would have been sufficient to have required a reversal of this case, towit: The effort of the county attorney to prove the bad reputation of defendant when the defendant had not placed his reputation in issue by offering evidence of his good reputation. Porter v. State, 8 Okla. Cr. 64, 126 P. 699; Morris v. State, 26 Okla. Cr. 399, 224 P. 377; Martin v. State, 29 Okla. Cr. 136, 232 P. 966."

Such has been the consistent and deeply embedded holdings in this state as is revealed by the following cases: Bean v. State, 77 Okla. Cr. 73, 138 P. 2d 503; Edwards v. State, 85 Okla. Cr. 125, 186 P. 2d 333; Giles v. State, 55 Okla. Cr. 145, 28 P. 2d 600; Uptown v. State, 12 Okla. Cr. 593, 160 P. 1134; Scott v. State, 48 Okla. Cr. 7, 288 P. 999; Tindel v. State, 47 Okla. Cr. 268, 287 P. 1109;

Pearson v. State, 44 Okla. Cr. 19, 279 P. 700; Hales v. State, 39 Okla. Cr. 297, 264 P. 918; Hales v. State, 39 Okla. Cr. 300, 264 P. 919; Harris v. State, 39 Okla. Cr. 4, 262 P. 700; Hargrove v. State, 37 Okla. Cr. 386, 258 P. 1060; Williams v. State, 37 Okla. Cr. 323, 258 P. 356; Wyrick v. State, 37 Okla. Cr. 115, 255 P. 163; Millett v. State, 36 Okla. Cr. 309, 253 P. 1039; Lumpkins v. State, 36 Okla. Cr. 256, 253 P. 909; Alexander v. State, 35 Okla. Cr. 89, 248 P. 873; Lindsey v. State, 31 Okla. Cr. 406, 239 P. 684; Brown v. State, 31 Okla. Cr. 85, 237 P. 141; Todd v. State, 30 Okla. Cr. 410, 236 P. 437; Grubbs v. State, 30 Okla. Cr. 256, 235 P. 1115; McPhetridge v. State, 30 Okla. Cr. 41, 234 P. 785; Martin v. State, 29 Okla. Cr. 136, 232 P. 966; Jenkins v. State, 28 Okla. Cr. 249, 230 P. 293; Smart v. State, 27 Okla. Cr. 433, 228 P. 611; Morris v. State, 26 Okla. Cr. 399, 224 P. 377; Salyer v. State, 25 Okla. Cr. 433, 221 P. 118; Whitlow v. State, 24 Okla. Cr. 307, 218 P. 162; Munson v. State, 23 Okla. Cr. 64, 212 P. 438; Reams v. State, 12 Okla. Cr. 363, 157 P. 273; Rogers v. State, 8 Okla. Cr. 226, 127 P. 365; Watson v. State, 7 Okla. Cr. 590, 124 P. 1101. Notwithstanding the fact that the foregoing rule is all but universally applied throughout the nation, and has been consistently followed both before and since statehood in Oklahoma, the county attorney on cross-examination of the defendant, proceeded on the theory that the defendant, by introducing evidence of specific acts of turbulence and violence committed by the deceased during his lifetime, opened up the subject whereby the state might make similar inquiry of the defendant covering a long period of time and as to specific acts, even though he had not made an issue of his character and reputation. The record reveals the following interrogation of the defendant on cross-examination, by way of attack on the defendant's reputation, and to prove he was of a violent and turbulent

disposition, all in relation to specific acts, and in violation of the long established rules hereinbefore referred to:

"Q. Jake, as a matter of fact you have been rather turbulent yourself in the past? Mr. Nesbitt: Objected to, improper cross-examination. The Court: Overruled. Mr. Nesbitt: Exception. * * * Q. Jake, isn't it true on various occasions you have shot that gun in and about the town? Mr. Nesbitt: Object to that; incompetent, irrelevant and immaterial; improper cross-examination, and if intended as impeaching, the question is not in proper form, has not fixed the time and place. The Court: I think it is too general and indefinite—sustained. (We include the last question only as characteristic of the cross-examination.) Q. About four years ago. Jake, isn't it true you shot up the front of Dr. Smith's office? Mr. Nesbitt: Objected to; incompetent, irrelevant improper cross-examination; not in proper form as an impeaching question, too remote in period of time to be of materiality in this case. The Court: There is no explanation in the question, nothing to show by it was shot up, whether it was an altercation or just shooting for fun or what. That is the objection the court has to the question, sustained. (Again we include this question, only because of the prejudicial character of the same. Some of the jurors no doubt believed such was true or the prosecutor would not have inquired about it.)"

The object of this type of cross-examination and the reason it was permitted clearly appears in the following statements of the special prosecutor and the trial judge:

"Mr. J. J. Smith (Special prosecutor) (Out of the presence of the jury): The state offers to show by this witness that he is a turbulent, high-tempered man given to seeing trouble, given to firing his pistol, having admittedly carried it continuously for several years, upon divers occasions without reason or excuse or provocation; that this evidence now becomes competent so that in rebuttal the offer may be supported by independent proof, not having been competent in chief. Mr. Nesbitt: To which of-

fer the defendant objects for the reason that the same is incompetent, improper cross-examination, not in proper form as an impeaching question, too remote in period of time to be of materiality, and for the further reason no proper foundation has been developed in this case to inquire into specific acts of turbulence and violence. The Court: The court is of the opinion that the defendant has opened up the question by his line of testimony in showing that the deceased was a quarrelsome, turbulent and dangerous fellow, to prove that he likewise is a quarrelsome, turbulent and dangerous person. The court having admitted the testimony offered by the defendant as to the turbulence of the deceased on the theory it had a tendency to show who was the aggressor and also to show whether or not the defendant was reasonable and had just cause for fearing the deceased, and that since the defendant had elected to open up that question as to the turbulence of the deceased, that he now likewise is subject to attack by the State for the sole purpose of showing and bearing upon the question of who was the aggressor, the defendant having interposed a plea of self-defense. The court announces the policy to counsel of following this rule in the trial of this case. The offer made by Judge Smith is not in keeping with the question. General proof in keeping with the offer will be allowed. Mr. Nesbitt: The defendant moves to strike all the testimony concerning alleged turbulent acts on the part of the defendant in this case for the reason that it is not only incompetent and subject to objection on the grounds heretofore interposed, but on the further ground that there is no evidence to show that the deceased was aware or knew of these turbulent acts, or relied thereon. The Court: The Court takes the position that it is immaterial in determining whether or not he was the aggressor as to whether or not he knew it, or whether he didn't. Mr. Nesbitt: Exception."

With the foregoing announcement by the court, the special prosecutor was then unrestrained in his cross-examination, as revealed by the following questions:

"Q. Jake, I will ask you to state if it isn't a fact that you on many occasions you have promiscuously and indiscreetly used your gun and have caused many disturbances? Mr. Nesbitt: To which question the defendant objects for the same that the same is too general in its terms, improper cross-examination, incompetent, not in proper form as an impeaching question, no particular time being fixed and for the further reason that none of the alleged turbulent acts on the part of the defendant in this case are shown to have been communicated to or known by the deceased in the case, or that he relied upon them in the manner charged in this complaint. The Court: Overruled. Mr. Nesbitt: Exception. A. No, sir. * * * Q. Jake going back just a minute to that question; in the early fall of 1943 didn't you shoot at Paul Jones in the top part of your building after a poker game? A. No, sir. Mr. Nesbitt: The defendant objects for the reason that the question calls for incompetent, irrelevant matter; not in proper form as an impeaching question; too remote in period of time to be of materiality in this case, and even if true the same has not been shown to have been communicated, known by or acted upon by the deceased in the altercation and controversy in this case. The Court: Overruled. Mr. Nesbitt: Exception. A. No, sir. There never was a card played there after I bought that place. They used to play pitch there before I bought it. * * * Q. Isn't it a fact that in the latter part of 39 or the first part of 1940 you pointed your gun, started to shoot your gun at one Bud Nelson, and John Jones grabbed the gun? Mr. Nesbitt: Objected to; improper cross-examination, not in proper form as an impeaching question, too remote in period of time to be of materiality in this case and for the further reason that even if true, which we don't admit it to be of course, the same is not shown to have been communicated, known by or acted upon by deceased. The Court: Where is that alleged to have occurred? Mr. Smith: In the Blue Goose Cafe. The Court: Overruled. Mr. Nesbitt: Exception. A. No, sir."

There was not a single solitary line of proof to support the questions asked on cross-examination of the defendant. This situation presents a perfect picture of the special prosecutor testifying by inference and innuendo. All of the foregoing evidence and colloquy clearly shows the nature of the cross-examination and under the circumstances its inadmissible character, as well as the theory upon which the same was admitted in evidence. In light of the foregoing authorities and the fact that the defendant had not put his character or reputation in issue, it was clearly reversible error for the state to cross-examine the defendant on the specific prejudicial matters hereinbefore set forth.

In support of the rule invoked by the trial court the Attorney General cites in his reply brief 40 C.J.S., Homicide, § 273, Note 44, wherein the rule contended for by the defendant is stated, as follows:

"It has been held, however, that where accused tenders the factual issue of the bad character of his victim to substantiate his plea of self-defense, he thereby opens the door for the admission of evidence of his own bad reputation as a quarrelsome, violent, and turbulent man", citing in support thereof the isolated case of State v. Robinson, 344 Mo. 1094, 130 S.W. 530.

Obviously, this case is in direct conflict with and an exception to the rule that the defendant's character and reputation cannot be attacked until he puts the same in issue by offering evidence of his own good character or by others in his behalf to that effect. In face of the overwhelming weight of authority in support of the rule followed in Oklahoma and most all the other states, we are not impressed with its efficacy. The reasons given for not following it are many. Wigmore says in vol. 1, § 57, page 454, Note 1, "the reason for not permitting an attack to be made upon the character and reputation of the

defendant until he makes such the issue is founded upon the long established policy of avoiding the uncontrollable and undue prejudice, and possible unjust condemnation which such evidence might induce" against the defendant, and to which we add, thus result in his condemnation upon collateral issues and not the primary issue on trial, thereby depriving him of his right to a fair and impartial trial. Not only is the Missouri case in conflict with the general rule, but the propriety of this cross-examination is in direct conflict with the holding in Porter v. State, supra, wherein after stating the general rule, against the right of the state to attack defendant's character before he puts his character in issue, in the body of the opinion said, 8 Okla. Cr. at page 67, 126 P. at page 700:

"The fact that appellant placed in issue the general reputation of the deceased as to his being a dangerous man did not place the character of appellant for peace in issue. *The questions asked the witness Steadham, with reference to the character of appellant, were all highly improper.* The insinuation which they conveyed was that appellant was an all-around bad man and a horse thief. It presented a style of prosecution of which this court does not approve. *No man should be clothed with sanctity or visited with condemnation simply because he is accused of crime.* He is entitled to fair treatment on his trial, and the presumption of innocence is his legal right until he has been convicted by the jury. *It would be a reproach to our courts to allow a defendant to be convicted by unfair means. A verdict should be based upon evidence, and not upon suspicions and prejudice.*

"In the case of Hicks v. United States, 2 Okla. Cr. 626, 103 P. 873, this court said:

" 'Unfairness, whether intentional or not, taints everything it touches, and will vitiate a verdict, unless it clearly appears from the record that there was no rational conclusion at which the jury could have arrived favorable

to the defendant; and it must be absolutely clear upon this question to wipe this taint out. Such is not the condition of the record in this case.' "

In Munson v. State, 23 Okla. Cr. 64, 212 P. 438, in syllabus 2, the court said:

"In the trial of a criminal case the issue is singular, and is based upon the question, 'Did the defendant commit the crime charged?' and not upon the question, 'Has the defendant the reputation of having committed the crime charged, or some similar crime?' "

In the body of the opinion 23 Okla. Cr. at page 67, 212 P. at page 439 the court said:

"It has been repeatedly decided by this court that the fact that an offense has been committed cannot be proven by common rumor or general repute.

"It is a fundamental principle of criminal law that the character of a defendant cannot be impeached or attacked by the state unless he puts his character in issue by introducing evidence of good character. Says Bishop:

" 'Bad character is never admissible in evidence against a defendant as ground for presuming guilt. This doctrine is absolute; thus, the evidence of stealing a horse cannot be reinforced by showing that the defendant is an associate of horse thieves.' 1 Bishop's New Cr. Proc. par. 1112.

"If it were the law that anything which has a natural tendency to lead the mind towards a conclusion that a person charged with crime is guilty must be admitted in evidence against him on the trial of that charge, the argument for the state would doubtless be hard to answer; but the law is otherwise. It is the law that a defendant in a criminal case is presumed to be innocent until the contrary is proved by competent evidence beyond a reasonable doubt. *Whether the law in this respect is wise or unwise, whether it accords with human reason and experience, whether it affords too great protection to the criminal or too little to society, are not questions with*

*which we have to do. It is not the province of the courts to change and relax the rules of evidence in order to facilitate convictions in a particular class of offense.* Until the lawmaking power intervenes and prescribes differently, the same rules of evidence must govern the trials of defendants in this class of offenses that govern in all other criminal trials. Kirk et al. v. State, 11 Okla. Cr. 203, 145 P. 307; Sims v .State, 11 Okla. Cr. 382, 146 P. 914; Richards v. State, 12 Okla. Cr. 224, 154 P. 72; Cantrell v. State, 12 Okla. Cr. 534, 159 P. 1092; Upton v. State, 12 Okla. Cr. 593, 160 P. 1134. It follows that the admission of evidence as to the general reputation of defendant was prejudicial."

Moreover, the evidence sought to be elicited on cross-examination docs not fall within any of the recognized exceptions to the general rule that the character and reputation of the defendant cannot be attacked until he puts the same in issue by offering evidence of his good character. This court has repeatedly held that evidence of other offenses such as a considerable portion of the foregoing cross-examination sought to elicit is admissible only for the following purposes, in Lizar v. State, supra:

"The general rule is that when a defendant is put upon trial for one offense, he should be convicted, if at all, by evidence which shows that he is guilty of that offense alone; and evidence which in any manner shows, or tends to show, that he has committed another crime, wholly independent, even though it be a crime of the same sort, is irrelevant and inadmissible.

"As an exception to this general rule, evidence of other offenses recently committed, similar to that charged, is admissible when it tends to establish a common scheme or plan, embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or when it shows guilty knowledge or intent in the commission of the offense charged, or where the other offenses are a part of the res gestae."

See, also, in this connection Pressley v. State, supra; Bean v. State, supra; Pierson v. State, supra; Wyrick v. State, supra; and in Salyer v. State, 25 Okla. Cr. 433, 221 P. 118:

"Where the prosecuting attorney asks a defendant on cross-examination improper questions, and where the questions are asked without expectation of answers, and where the plain purpose is to prejudice the jury against the defendant, the judgment of conviction will be reversed, unless it appears that the questions could not have influenced the verdict."

Herein it appears that the questions were asked without expectation of answers, and were of such a prejudicial nature that they no doubt did influence the jury. It clearly appears that most all of the matter sought to be covered in the cross-examination hereinbefore set forth, even if it had been in the form of substantive proof, does not come within any of the exceptions discussed in Lizar v. State, supra. The cross-examination herein complained of constituted an indirect unsupported attack upon the reputation of the defendant in violation of the rule against such attack where the defendant had not made an issue of his character and reputation by offering evidence in support thereof. Therefore, it clearly appears that the cross-examination herein under consideration does not even rise to the high level of an evidentiary attack, but may be defined as a dangling attack, based only upon speculation, surmise, innuendo, conjecture and inference created by the series of questions asked by the state with the obvious purpose to discredit and destroy the defendant's reputation, so as to bring about his conviction regardless of his plea of self-defense, and his evidence in support thereof, a procedure this court has never sanctioned and often condemned.

The writer of this opinion was first impressed by the Missouri rule, and concedes now it is not without arguable merit. But mature consideration leads the majority of the court to the conclusion that to adopt the reasoning of State v. Robinson, supra, on the assumption that it would bring to light the whole truth as asserted therein, and that the key being with the defendant, he could either open the door by making an attack upon the reputation of the deceased for turbulence and violence or keep it closed by refraining from so doing, would require us to break with long established precedents, which have served the nation and this state well in the administration of justice. Moreover, the adoption of the Missouri rule in our opinion would not result in the exposition of the truth, so much as it would tend to open the door to confusion and irreparable prejudice, which would be created by overzealous and ambitious special prosecutors (who too many times are interested only in getting convictions regardless of the manner and means.) Then, too, under the Missouri rule, the temptation of abuse is too great to be resisted, to ask questions such as herein involved, on the assumption that the prosecutor would prove the facts of inquiry in rebuttal, and then failing so to do seek to excuse himself on the theory that he had acted in good faith. We believe that the temptation thus created would offset any benefits to be derived from such procedure. In other words, the evils we would flee to would exceed the sins we would seek to avoid. Furthermore, to follow the Missouri rule would plunge us into an extended experimentation relative to a rule of evidence tested in the crucible of centuries of time and designed to protect the rights of the accused. We are of the opinion that the experimentation of the past has established this safeguard around the defendant as a "must" in the administration of justice. Such must continue to

be the rule if we are to indulge the presumption of innocence until guilt has been established beyond a reasonable doubt. It is contended that the Missouri rule is a progressive one, designed to get the whole truth. If we could be sure that such was the case and the inquiry would end in relevancy of the matter elicited, we would be more impressed with the Missouri rule. But it seems inescapable to us, that it would raise a variety of issues, divert the attention of the one immediately before the jury and, in many instances, provoke the conviction of the accused upon general principles instead of on the issues involved in the particular case. In other words, it would substitute totalitarian justice for fair and impartial justice. As some of the authorities hereinbefore cited hold, the issue on trial in a homicide case is singular. We are not persuaded that the invocation of the Missouri rule would lead to convictions upon the particular charge confronting the defendant, but we fear that a conviction would be had in many instances upon proof of other acts in no way connected with the charge as laid in the information. Furthermore, it would have a tendency to confuse the defendant in his defense. He would never know what issue he was called upon to meet until the same was sprung as a surprise in the trial of the case. Witness, as an example, the cross-examination in the instant case. The defendant was not only required to answer for the sin with which he stood charged, but many maledictions, in no way connected with the charge. Such procedure was contrary to that fundamental rule in our jurisprudence that the accused shall be informed of the accusation he shall be required to meet. Under the Missouri rule no defendant could approach a trial with any degree of certainty relative to the issues he would face by innuendo, speculation, unfounded inference, and many times pure fabrications. Furthermore we must

bear in mind that while judges, trained in the law, may be able to eliminate from a mass of general criminative facts those which do not directly bear upon the crime charged against the accused, such is not always true of the ability of juries. Certainly, they are not trained in the processes of elimination of irrelevant, from relevant and controlling matter. The reason judges preside over trials is because they are trained in the processes of analysis and exclusion of prejudicial evidence which tends to raise in the jury's mind an antipathy to the prisoner. If we are to adopt the Missouri rule no such meticulous care as required by judges in eliminating irrelevant issues in the trial of a case would be needed. Under the adoption of this rule, we fear trials would degenerate so far as the defendant was concerned into boards of inquisition to determine the issues, not upon the single fact charged in the information but extend to the entire scope of the life of the defendant which could only result in conviction in many cases on general principles. We can visualize many instances, under the proof, where the defendant would be entitled to be exonerated on the charge as laid in the information, and yet become the victim of the jury's general antipathy towards him. 1 Wigmore on Evidence § 194, page 646, gives the reasons for exclusion of evidence such as was sought to be injected into the trial of the instant case in the foregoing cross-examination, as follows:

"It may almost be said that it is because of this indubitable relevancy of such evidence that it is excluded. It is objectionable, not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of

the present charge. Moreover, the use of alleged particular acts ranging over the entire period of the defendant's life makes it impossible for him to be prepared to refute the charge, any or all of which may be mere fabrications."

He further says at page 650, the reasons for excluding this type of evidence is:

"(1) The over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts; (2) The tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offences; both of these represent the principle of Undue Prejudice (post, § 1904); (3) The injustice of attacking one necessarily unprepared to demonstrate that the attacking evidence is fabricated; this represents the principle of Unfair Surprise (post, § 1849).

"* * * (4) that the Confusion of new Issues is a reason for avoiding such evidence * * *."

This court has demonstrated its willingness to treat the law as a progressive science and to abandon out-moded procedural practices, demonstrated to be erroneous, and not an aid to the administration of justice. Ex parte Lewis, 85 Okla. Cr. 322, 188 P. 2d 367. Likewise we have demonstrated our reluctance to abandon true and tried principles merely for the expediency of the prosecutor in order that he may find it easier to obtain convictions. The first duty of this court is to protect the defendant's right to a fair and impartial trial, and that we will do, to avoid such situations as we are herein confronted with. It is not our place to legislate but to interpret. If the Legislature finds the rule of evidence herein involved outmoded as a vehicle of justice, they may change the same by laying down a new and different rule. Hence, we are loathe to disturb long established rules of evidence such as are herein involved which have demonstrated their free-

dom from abuses. To tinker with this time honored and proven rule of evidence would tend to destroy the wholesome concept that this is a government of laws and not of men. It would tend to subject a citizen to the caprice of men and not of laws. It would create the possibility for political persecution through the abuse of judicial power by changing the rules of evidence to fit the occasion. It may be said such is not the case at hand and that is true, but, where the possibility of abuse exists there is always the threat, and the measure of judicial wisdom is not only in immediate justice but in anticipatory discernment. In fact, the true test of judicial wisdom is in the pronouncement of rules in any case that will obviate abuses of power. Every case should be measured not in its immediate effect but prospectively. In no other way may, particularly life and liberty, as well as property be secure and this continue to be a government of laws and not of men. State v. Stout et al., 90 Okla. Cr. 35, 210 P. 2d 199. Here we know that the old rule contended for by the defendant has worked well for generations. We would have no excuse to abandon it unless we can clearly see that the new rule contended for would work better. Certainly we would not be justified in abandoning it unless we could see a minimum of abuse that we do not now see.

Finally, it suffices to say that in any event this is not a case where the Missouri rule can be invoked. The state did not bring this case within that rule. The Missouri rule is not satisfied by merely asking highly prejudicial questions on cross-examination. If the trial court desired to invoke the same, the cross-examination should have been followed up with proof relative to the matters inquired about on cross-examination. Hence, we could

not invoke the rule in this case were we inclined so to do, which we are not so disposed to do.

The state of this record presents a case where the defendant's rights were prejudiced by unfair cross-examination, from which conclusions could be drawn by the jury based upon surmise, suspicion, speculation, innuendo and inference only, and not proof. Such procedure was highly prejudicial under the long established principles of this state. Regardless of the defendant's guilt he is entitled to a fair and impartial trial, free from the taint of inquisitorial prejudice. This the defendant did not have in the instant case.

In addition to the foregoing assignment, the defendant made numerous other assignments of error which have substantial merit. One of these assignments deserving more than passing notice related to the court's failure to grant a continuance on the ground that two of the defendant's material witnesses were temporarily out of the state. It shall not be necessary to go into an extended discussion of this point. It appears that their whereabouts were known, and that they could have been available at the next term of court, and that the evidence of one of the absent witnesses, Franklin McGinnis, was most material to the defendant. It would have been to the effect that a certain nickel plated pistol, he identified at the preliminary, was the one he saw Doc Wilson have in his hand just before the killing, and that he saw him take it from his pocket and hold it in his hand on his knee. This was material to the plea of self-defense, and to have granted the continuance for the term would not have entailed too great a delay. The crime was committed on February 27, 1947, and the trial set for May 21, 1947. No other request for continuance had been made. Here the motion was not resisted on the ground it was

made in bad faith and was without merit. This court has held in many cases that the failure to grant a continuance under such conditions as herein involved constituted an abuse of discretion and reversible error. Compton v. State, 48 Okla. Cr. 120, 289 P. 794; Dawes v. State, 34 Okla. Cr. 225, 246 P. 482; Madison v. State, 6 Okla. Cr. 356, 118 P. 617, Ann. Cas. 1913C, 484. This apparent error combined with the other errors hereinbefore discussed, convinces the majority of the court that this case cannot be reconciled by applying the harmless error doctrine to it. But, for all of the foregoing reasons, it must be and is accordingly reversed and remanded for a new trial.

JONES, P. J., concurs. POWELL, J., dissents.

POWELL, J. (dissenting.) I cannot agree with the majority opinion. I feel that there is confusion, and due heretofore in large measure to my inability to clearly derive a proposed exception to a well recognized rule of law. The opinion goes to great length in explaining the recognized rule, with which I find no fault as a general proposition, but does not adequately give consideration to the exception, but summarily condemns it.

This thought is supported by the fact that it was not deemed necessary to set out the facts in the case, and several readings of the opinion fail to reveal the mentioning one time by quotation or otherwise of the real problem involved, and presented to the lower court during the course of the trial, to wit: *that of determination of who was the probable aggressor.* The statement of the problem is omitted, no steps are detailed to support the conclusion, though the answer is furnished at length. I shall later try to demonstrate what I mean.

This court has had for consideration whether or not this case should be affirmed under the provisions of the harmless error doctrine, Tit. 22 O.S.A. §§ 1068, 1273, and if so, whether or not the record justified the further treatment of the question of approving an exception to the rule generally prevailing in the United States and most English speaking countries which forbids the introduction of any evidence as to the bad character of the accused until he first introduces evidence as to his good character. The majority opinion details the reasons for the rule, which we heartily agree with and over which there is no difference of opinion, though under the Continental procedure in France no such rule prevails and hearsay evidence even is freely admitted, and I certainly do not advocate that. See opinion by Peckham, J., in People v. Shea, 147 N.Y. 78, 41 N.E. 508, in which is discussed the French method for the judicial investigation of crime and the conduct of criminal trials.

The record herein assuredly justifies the affirmance of the judgment entered because of the harmless error doctrine. For while admittedly the cross-examination of the defendant detailed in the majority opinion went too far, yet the attorneys for the defendant were not blameless in this regard, though their errors were not pointed out, and it is my thought that the errors about balanced. But a demonstration requires a summary of the entire evidence.

It is also contended in the majority opinion that this is not a proper case for a consideration of the exception to the character rule, which exception is in the majority opinion designed the "Missouri rule", (though the exception was adopted in two other states many years before), the implication being that treatment would constitute dicta, but the greater part of the opinion nevertheless is

devoted to a condemnation of the exception sought. And while this case could be disposed of by application of the harmless error rule, as stated, nevertheless the lower court and counsel treat the question as being involved, and if dictum, the treatment would be judicial dictum as distinguished from obiter dictum. 21 C.J.S., Courts, § 190.

I feel that the so-called "Missouri rule" should be by this court adopted. Of the many Oklahoma cases cited, not one discusses the reasons for or against the proposed exception to the rule, only the rule is gone into, and in view of the apparent misconception of the purpose as well as the probable effect of such an exception, I feel impelled in the public interest to treat the issues raised by the appellant in his brief in detail rather than treating too much the expressions in the majority opinion of apprehensions of unfairness that might result as against an accused, should the same rule apply to him as to the state. I feel that these fallacies will be revealed more clearly, if my solution of the problem is correct, by stating the problem, the exception contended for, and the recognized reasons why the adoption is desirable. I would refrain from speculative philosophy: a route of many roads leading from nowhere to nothing, so far as solving the problem, but would treat the matter step by step.

I do not believe that anyone can study the testimony of the witnesses in this case, yes, even the evidence of the defendant's witnesses alone, and not be beset with doubt as to whether Jake Roberson acted in self-defense under a well-grounded apprehension of immediate danger when he shot Ben or "Doc" Wilson to death, killing even an innocent bystander behind him whom he sought refuge. I feel that the majority of the court now have this doubt. It can be appreciated, then, the importance of the applica-

tion of correct rules of evidence in this type of case in aiding the jury to get to the truth of the matter, which in many instances it has been aptly said "is stranger than fiction", and determine who was the probable aggressor. Fairness and impartiality should at all times control the actions of courts, and any rule that would permit one litigant the right to present one type of evidence, but at the same time deny the other litigant the benefit of the rule, is not in accordance with good conscience, and in a democracy cannot stand, and no doubt would have been corrected long ago except that the citizens at large represented by the state are the ones being discriminated against, and under such circumstance much time is required for the general public to become conscious of such discrimination,—and in the absence of relief by the courts, through courageous interpretations, wipe out such discrimination by legislation. It seems that everybody's business is nobody's business. On the other hand, the criminal lawyer, ever alert for liberal rules favorable to those charged with crime, would no doubt long ago have become most articulate for the modification of this rule should it have favored the state rather than the defendant.

I would point out in support of this that although it is well known that the average criminal lawyer, more experienced and more competent by reason thereof than the average county attorney (who too often is a young man just out of school and who serves from two to four years, or an old attorney about ready to retire), as a rule does not hesitate to attempt matters that if attempted by the county attorney would constitute reversible error. If there is doubt, it might be enlightening in this connection to read "Moman Pruiett, Criminal Lawyer" published by Harlow Publishing Company, Oklahoma City.

Furthermore, I would point out that under provisions of Tit. 22 O.S.A. § 1053, it is provided:

"Appeals to the Criminal Court of Appeals may be taken by the State in the following cases and no other:

"1. Upon judgment for the defendant on quashing or setting aside an indictment or information.

"2. Upon an order of the court arresting the judgment.

"3. Upon a question reserved by the State."

But in spite of this, and in spite of the fact that of all the cases tried in the 77 counties of the state and appealed to the Criminal Court of Appeals, out of the latest 1,500 such cases, only 16 of them were appealed by the state. The reasons and remedy for this cannot be considered here. But by the fact of the inroads of organized crime throughout the country, we feel justified in examining any rule that would deprive the state of the same fairness accorded the accused.

The adoption of the so-called "Missouri rule" would mean that the person charged with a homicide would be tried, rather than the dead man, as is now possible by the unfair and impartial rule of evidence the majority of the court would adhere to, and apparently just because we have adhered to it for so long and that it is the majority rule. This is an excellent opportunity to apply the progressive principles announced in vigorous and fine language in the excellent opinion by Judge Brett and concurred in by the other judges in Ex parte Lewis, 85 Okla. Cr. 322, 188 P. 2d 367, at pages 377, 378, but which is brushed aside as far as this case is concerned.

I am impressed, in connection herewith, after casual study, of the provocative lecture, being The Eighth Annual Benjamin N. Cardozo Lecture Delivered Before the

Association of the Bar of the City of New York by Associate Justice William O. Douglas of the Supreme Court of the United States, on "Stare Decisis", as reported in Vol. 21, Journal 7 of the Journal of the Oklahoma Bar Association dated February 25, 1950. At one point Justice Douglas said:

"It is, I think, a healthy practice (too infrequently followed) for a court to re-examine its own doctrine. Legislative correction of judicial errors is often difficult to effect. Moreover, responsible government should entail the undoing of wrongs committed by the department in question. That course is faithful to democratic traditions. Respect for any tribunal is increased if it stands ready (save where injustice to intervening rights would encur) not only to correct the errors of others but also to confess its own. This was the philosophy expressed by a judge of the New York Court of Appeals almost a century ago when he proclaimed it 'the duty of every judge and every court to examine its own decisions, * * * without fear, and to revise them without reluctance.' "

Cited were: Great Northern Ry. Co. v. Sunburst Co., 287 U.S. 358, 53 S. Ct. 145, 77 L. Ed. 360, 85 A.L.R. 254; Aero Spark Plug Co. v. B. G. Corporation, 2 Cir., 130 F. 2d 290, 296-299; Baker v. Lorillard, 4 N.Y. 257, 261.

It is felt that in a proper case and with a proper record made out of the presence of the jury by an alert county attorney, that this court, at a future time, may see fit to re-examine the exception herein involved.

But enough for generalities. We get to the problem.

For a reversal of this case defendant in petition in error sets out 24 specifications of error alleged to have been made, but in the brief filed herein argues his case under four main propositions or assignments of error. The record herein contains over 400 pages, the state using 12 witnesses in chief and seven in rebuttal, the de-

fendant using 18 witnesses. The defendant has filed a very able brief, and likewise the Attorney General has demonstrated thorough consideration. But this case has particularly required re-reading and re-study of the evidence and entire record.

I shall first consider defendant's assignment of error Three that:

"The Court erred in forcing defendant to trial over his objection when a list of the State's witnesses with the post office address of each had not been served on defendant."

The return of the sheriff on notice of presentation of witnesses, sets out that on the 17th day of May, 1947, notice was served on the defendant Jake Roberson, in the jail in Ottawa county. When the case came on for trial on May 21, 1947, the county attorney requested permission for endorsement of additional witnesses on the information, which the court permitted. The following objection was interposed:

"Mr. Nesbitt: The defendant wishes to object to the endorsement of additional witnesses on the information for the reason that the list of witnesses presented to the defendant was not served within the time or in the manner provided by law. The Court: When were they served? Mr. Beauchamp (Assistant County Attorney): They were served Saturday by the sheriff. Mr. Nesbitt: They procured his acknowledgment on Monday. The Court: Better offer proof on that. Mr. Beauchamp: Your Honor, it was served in that manner because Mr. Nesbitt was out of town, called out of town. The Court: Does the return show it was served Monday or Saturday? Mr. Nesbitt: Shows Saturday, that is when it was served. Mr. R. W. Smith (County Attorney): What happened, Mr. Allemann didn't know he was to have him sign it. He served him on Saturday, gave him the list and took it down to him. Found that was to be on it and couldn't

locate him and went back Monday morning and had him sign he received it on Saturday. The Court: All right, endorsement of the names will be permitted. Mr. Nesbitt: Exceptions."

Conclusively, the list of witnesses, excluding the new witnesses permitted to be endorsed, was served on both the defendant and his attorney four days prior to trial, and the constitutional provision, art. II, sec. 20, Okla. Const. requiring that the notice be served two days prior to trial, was complied with.

Thus we see that defendant's real objection was to the endorsement of the additional witnesses just prior to trial. This feature presents a serious question. I shall next consider the failure to include the respective addresses of the state's witnesses on either the information or the notice. If the defendant had objected on that account, on proper showing by defendant, it would have constituted reversible error for the court to have refused a two-days continuance, or, under proper facts, even additional time, to give the attorneys for the defendant opportunity to investigate the character, bias, and antecedents of the witnesses against him, and to learn something of their testimony and thereby better enable him to prepare for trial. See: Goben v. State, 20 Okla. Cr. 220, 201 P. 812, and cases cited.

No doubt at the time of trial the reason counsel for defendant failed to raise any question as to the addresses of the witnesses and to allege that the omission of such addresses had prevented counsel for defendant from contacting witnesses, was because, in fact, this omission had caused no hardship or inconvenience, the record of the trial disclosing that all of the witnesses that the state used lived in or near Fairland, were neighbors and well acquainted with both the defendant and with the deceased

during his lifetime. And most, if not all, had testified at the preliminary hearing and had been further questioned by defendant or his counsel. The reason for the rule under the constitutional provision clearly did not exist. Further, under the decisions of this court, as applied to the facts developed in this case, the omission of the addresses of the state's witnesses was waived by the defendant, no objection or motion for continuance setting out such omission as grounds for objection or for continuance having been interposed. See: Sweet v. State, 70 Okla. Cr. 443, 107 P. 2d 817; Smith v. State, 69 Okla. Cr. 17, 99 P. 2d 527; Galbert v. State, 12 Okla. Cr. 571, 160 P. 2d 332; State v. Frisbee, 8 Okla. Cr. 406, 127 P. 1091.

In Little v. State, 25 Okla. Cr. 190, 219 P. 424, this court said:

"The omission of post office addresses of certain witnesses for the state, on the list of witnesses for the state served on the defendant, is not vital, where the post office addresses are known to the defendant, and where each of the witnesses had testified; and been cross-examined at the preliminary trial."

While the court did permit additional witnesses to be endorsed on the information and notice just prior to trial, which ordinarily, in a felony case where capital punishment might be assessed, would constitute reversible error, herein the error was harmless. The record discloses that of the witnesses endorsed, only two were actually used in chief, the others not being used, or used in rebuttal. And it was not necessary, of course, for the rebuttal witnesses to be endorsed on the information or be included in the notice. See: Sweet v. State, supra.

The two witnesses endorsed on the information just prior to trial, after notice had been given, were C. D. Wil-

son and John Jones. The evidence of the witness C. D. Wilson was strictly cumulative, as was the evidence of the witness John Jones, and this court has held that it is harmless error for the trial court to permit the endorsement of an additional witness or witnesses on information or notice furnished defendant less than two days prior to trial, where the evidence of such witness or witnesses is cumulative. Manning v. State, 7 Okla. Cr. 367, 123 P. 1029; Havill v. United States. 5 Okla. Cr. 334, 115 P. 119; Ferguson v. State, 53 Okla. Cr. 317, 11 P. 2d 211; Whitworth v. State, 32 Okla. Cr. 200, 239 P. 930.

Wilson testified to seeing a pistol underneath the deceased when he was lifted from the Blue Goose floor. And John Jones testified to the location of a bullet hole on the north wall of the room about twelve feet from the front end. Other witnesses for both the state and defendant testified to this, and such evidence could not have prejudiced the defendant, as it was his contention that the deceased was armed, and defendant, as stated, sought by witnesses to show that a pistol was found under deceased when he was raised from the floor, and defendant admitted shooting at the deceased from the southwest portion of the building, which was the rear, toward the front. Objections to the testimony of these two witnesses were not interposed at the time they were called upon to testify, and the court was not requested to strike the same, and nothing was pointed out to show the same to be prejudicial. This court has held that it will not reverse a conviction for a mere technical error when it can see that it could not have affected the result. As Judge Doyle once said, in Havill v. United States, supra [5 Okla. Cr. 334, 115 P. 124]:

"Absolute correctness of proceedings cannot be attained, even in our very best courts; and the establishment of any other rule would render the enforcement of the criminal laws practically inoperative."

See, also, comments of Judge Furman, in Edwards v. State, 9 Okla. Cr. 306, 131 P. 956, 963, 44 L.R.A., N.S., 701.

This court in many cases has held that when an error has been committed in the trial court it is the duty of this court, on an inspection of the entire record, to determine if defendant suffered any material injury from such error. Unless such injury appears, the error will not be ground for reversal. Mitchell v. State, 7 Okla. Cr. 563, 124 P. 1112; Needham et al. v. State, 55 Okla. Cr. 430, 32 P. 2d 92; Andrews v. State, 84 Okla. Cr. 104, 179 P. 2d 491.

It is next urged that the court erred in overruling defendant's motion for continuance.

The record discloses that on May 2, 1947, the court entered an order setting this case for trial for May 21, and on May 12 counsel filed a motion for continuance, based on the absence from the state of Franklin McGinnis, whose evidence was alleged to be very material as to matters that could be proved by no one else. McGinnis had testified at the preliminary hearing, his testimony had been taken down, and he had been cross-examined at length by counsel for defendant. Defendant also sought the testimony of one Walter Wilmouth, for rebuttal evidence. He had not testified at the preliminary hearing. It is alleged that McGinnis was in the town of Moses Lake, in the State of Washington, and Wilmouth somewhere in California, and that they were to return at some indefinite time in the fall of that year.

No continuance was sought for the purpose of taking depositions, but a continuance for the term was desired. The record reflects that these two witnesses departed following the preliminary hearing in March. The trial court was faced with the possibility that the witnesses might never come back, and if so that by that time some of the other of the more than 30 witnesses might be dead or out of the jurisdiction of the court. The affidavit for continuance did not set out sufficient facts as to their whereabouts, communications with them, or effort so to do. The affidavit was too indefinite in this regard. However, if the evidence of the two proposed witnesses was vital to the defense of the defendant, and not cumulative, it would be the duty of the court, in furtherance of justice, to have granted a continuance, not necessarily for the term, but to reset for a later time. Compton v. State, 48 Okla. Cr. 120, 289 P. 794.

The county attorney agreed that the testimony of Franklin (or "Blabber") McGinnis, given at the preliminary hearing might be read in evidence as a deposition, and stated that it was his intention to have such testimony read. McGinnis was also listed as a witness for the state. The county attorney failed to use McGinnis' testimony, and the defendant likewise failed to introduce such evidence. Counsel wanted the state to agree that in addition to the evidence given on preliminary that McGinnis would further testify that after the new owner of the cafe, Kenneth Langston, had advised Doc Wilson to leave the cafe to avoid trouble with the defendant, that Doc Wilson did leave for a little while and that Doc's wife, Elaine Wilson, told McGinnis that her husband had gone for a gun and asked him to go and watch the back door and keep her husband from returning, and that he did so, but that Wilson returned by the front door.

The county attorney would not agree that McGinnis would so testify. Such proposed additional evidence was strictly rebuttal in nature, and was proven, except as to the gun feature, by Roy Martin, another witness for defendant. If the testimony actually given at the preliminary hearing by McGinnis was deemed by counsel for defendant to be material, he should have introduced the same. He cannot now complain on account of its omission. Though not exactly in point, this principle is involved in Fields v. State, 85 Okla. Cr. 439, 188 P. 2d 231. But was the evidence of McGinnis material to the defendant's theory of the case? The defendant did not deny the shooting of Doc Wilson, but he contended that he shot at Doc five times in self-defense. The county attorney in his opening statement proposed to prove that Doc Wilson did not have a gun (recognizing that there would be a conflict in the evidence), but that if he did have one, that he did not produce the gun until after the defendant had fired at least three shots and perhaps five.

At the preliminary hearing McGinnis testified that he talked to Doc Wilson just prior to the shooting and while Wilson was sitting in booth two at the Blue Goose drinking beer with his wife and Vearl Hopkins and Ben Grigsby, and advised Wilson to leave, as he thought there might be trouble, and that Doc took a gun out of his right-hand coat pocket and laid it on his knee and said that he would see whether he had to get out or not. While there was a conflict in the evidence, this, of course, would have been proof that the deceased did in fact have a gun prior to the difficulty. The material point was whether he ever attempted to use the gun, if he in fact had one. McGinnis could give no evidence as to that.

On the trial defendant, referring to Franklin (or "Blabber") McGinnis, testified:

"He asked me if I knew Wilson was up there, and I told him I thought maybe he was, didn't know for sure and I said, 'why don't you go up there and tell Wilson to leave, I don't want no trouble' ".

Defendant further admitted that he had been armed with a pistol under his belt since about dark and standing near the cigar case in the southwest portion of the cafe, and that he observed Wilson and his party in booth number two drinking beer. The evidence further showed that Jake Roberson and his son had recently sold the Blue Goose Cafe, which was no longer used as a cafe but as a beer parlor, to one Kenneth Langston, and that Roberson's son, Gene, was actually assisting Langston in waiting on customers, but that the defendant was not working but just standing around, though he testified that he had agreed to assist Langston for a couple of weeks after the purchase. Langston was not called upon to affirm this. The evidence of Gene Roberson was to the effect that when Wilson first came in that he and his father shortly thereafter left for home to get supper, and that the son tried to get the father not to return to the cafe that night, but that he insisted. Thus the record indicates that the defendant armed himself and was looking for trouble, by reason of sending messages to Wilson, whom the uncontradicted evidence shows to have been conducting himself as a peaceable customer at least up to the time of the demand by Roberson that he leave.

If McGinnis's testimony had shown that Doc Wilson had the gun in his hand when he arose in his booth, or that he shot first, such evidence, though it would have been cumulative to that of the defendant and his son Gene and Jack Blalock (the latter's testimony being on rebuttal impeached), would have been of importance. But McGinnis denied seeing a gun in Doc Wilson's hand after he arose in the booth, and though in answer to leading

questions McGinnis would not state who fired any shot or the first shot, his evidence was that he moved away from the booths when the first shot was fired, and he identified that first shot as hitting the booth. He was asked:

"Q. How come you to move away from the booth? A. Because I saw the bullet hit the booth. Q. Where did the bullet come from? A. I don't know, I couldn't say. Q. Where did the bullet hit the booth and what booth was it? A. It hit on the corner there somewhere. * * * Q. Did the bullet hit the booth before Doc got up or after? A. It was after he got up. * * * Q. Didn't see any gun in Doc's hand? A. Not after he got up I didn't. * * * Q. Did you look around while the shooting was going on? A. Not after the first shot was fired. Q. You didn't look after the first shot was fired? A. Not after that shot hit the booth."

The booths were in the northeast portion of the building, and defendant was standing in the southwest portion of the room from the booths, so that from the evidence of McGinnis, the deceased, if he fired, could not have fired the first shot, because the first shot, McGinnis stated, hit one of the booths, and that caused him to move away fast. The defendant admitted shooting toward Doc Wilson and the booths. From this record we cannot see where the evidence of McGinnis could have been of any benefit to the defendant. It tended to show that the defendant was trying to stir up trouble by sending messages to the deceased while he was in a public place where he had a right to be, and that even if deceased might have been armed that defendant fired the first shot, and McGinnis testified that he did not see a gun in Wilson's hand after he got up. In the place of helping defendant, it would appear that such evidence would have hurt him, and it must be assumed that such was the reason counsel for defendant saw fit not to use

it. The jury could have concluded from such evidence that defendant was attempting to get the deceased to make some move towards attacking him so that he could shoot him. This evidence might have caused the jury to have found the defendant guilty of murder and have assessed the death or life penalty. By finding the defendant guilty of first degree manslaughter, rather than murder, the jury apparently gave defendant the benefit of every doubt the most favorable view of the evidence justified. And the trial court was most lenient in assessing the punishment at 15 years in the penitentiary.

The case of Madison v. State, 6 Okla. Cr. 356, 118 P. 617, Ann. Cas. 1913C, 484, cited by defendant as supporting his motion for continuance, has long since been by this court overruled. See Andrews v. State, supra.

The proposed evidence of Walter Wilmouth was rebuttal in character, as indicated, and if he had been present his testimony would have been inadmissible for the reason that the witness Elaine Wilson did not at the trial testify that Wilmouth had told her and her husband and one Jack Stafford that Jake Roberson was gunning for Doc Wilson.

It has long been the rule of this court that the granting of continuance is largely in the discretion of the trial court, and the overruling of an application for continuance will not constitute reversible error unless there has been such an abuse of discretion as results in a denial of a substantial right. See Frazier v. State, 81 Okla. Cr. 120, 161 P. 2d 84; Scott v. State, 72 Okla. Cr. 305, 115 P. 2d 763; and see Litchfield v. State, 8 Okla. Cr. 164, 126 P. 707, 45 L.R.A., N.S., 153, where it is said:

"Although an application for a continuance may appear to be good upon its face, yet if upon the trial the

record discloses the fact that the testimony asked for would be cumulative, or that such testimony would probably not influence the action of the jury in finding a verdict, a conviction will not be reversed upon appeal."

See, also, Owen v. State, 13 Okla. Cr. 195, 163 P. 548; Graham v. State, 28 Okla. Cr. 266, 230 P. 763.

This court held in Petty v. State, 11 Okla. Cr. 438, 147 P. 782, that:

"An affidavit for continuance on the ground of the absence of material witnesses, who are out of the state, which states that the defendant expects to procure their attendance at the next term of court, to be sufficient should state the grounds of such expectation, so that the court may determine whether or not it is reasonable."

And further:

"In reviewing the refusal of a continuance on account of absent witnesses, the record will be examined, and the evidence adduced at the trial will be considered by this court for the purpose of determining whether the showing made was such as made it the duty of the court to grant the continuance."

See Presley v. State, 76 Okla. Cr. 120, 134 P. 2d 595, approving the rule announced in Petty v. State, supra.

Because of the facts above recited, I find no error on the part of the court in refusing to grant a continuance in this case.

For a consideration of the remaining specification of error, necessarily and for a clear understanding of the issues, I must now review the evidence. And, as heretofore stated, over 30 witnesses were used. To quote freely would unduly lengthen this opinion, so I shall attempt to summarize the evidence as a whole, keeping direct quotations to the minimum. I would summarize relevant undisputed evidence and then disputed evidence,

and refer finally to the line of testimony claimed to be incompetent by the parties.

The record discloses that at the time of the killing the defendant was a man about 60 years of age; ruptured and had asthma, and physically was no match for a personal encounter with the deceased Doc Wilson. That he had lived in Ottawa county since 1904 except for seven or eight years, and had been a farmer until 1941 when he purchased the Blue Goose Cafe in Fairland, except he sold out a couple of times for about three months each, then re-purchased. Roberson and his son Gene operated the cafe up until about three weeks prior to the killing, when they sold to one Kenneth Langston. That they promised Langston that they would stay around and help him with the business for a couple of weeks. There is no evidence that the deceased knew of this agreement.

Elaine Wilson, wife of the deceased Doc Wilson, had worked in the Blue Goose Cafe for Jake Roberson and his son until about five or six months prior to the killing; her husband Ben, commonly called "Doc", had some words with Jake Roberson, the defendant, over some gambling with a skeeball machine. He accused Jake of cheating, but they were friendly enough that Elaine Wilson kept working for Jake, and in September prior to the shooting February 22, 1947, Jake Roberson, Elaine Wilson, Doc Wilson, Bud Botts and Walter Wilmouth left the Blue Goose Cafe in Botts' car about 7:30 one evening and drove to Afton, riding around and to spend a social evening together, visited a cafe by the "Y", and all had been drinking. At midnight when they started to return home in Botts' car, Doc Wilson and Jake Roberson had a fight, and Roberson got beat up about the face by Wilson using his fists; that Wilson was about 34 years of age and weighed 145 or 150 pounds and was

husky and that he got Roberson down and Roberson cut Wilson in a number of places with his knife, and Bud Botts pulled or helped pull Doc off of Jake.

At this point there is a dispute as to the circumstances of the fight. Jake claims that Wilson and his wife were out back of the car and that Wilson was beating up his wife and that he got out and "told Wilson and his wife to stop fighting and let's go home"; that Doc knocked him down and got a-straddle of him and beat him about the face with his fists; that he managed to get a heavy farm knife open and commenced cutting Doc and Doc said: "I will kill you if it's the last thing I do."

Botts testified that he, Botts, was drunk, that Wilson and his wife had some trouble back of the car and later he saw Wilson on top of Roberson beating him, but he did not know who started the fight. Elaine Wilson denied that Doc was beating her, but testified that they had left the cafe and entered Bud Botts' car to go home, but Botts kept sitting there and would not get his key and that Doc got out and tried to get another party to take them home, but could not and that he was standing by the car talking to Botts who had his feet hanging out the door and that Jake Roberson got out of the car and went around and struck Doc, knocking him down, and that Doc fought Jake, getting on top of him and that she and Bud Botts pulled Doc back and off of Jake and that she got cut on her hand by Jake in helping pull Doc off of Jake.

The undisputed evidence after this is that Doc Wilson and his wife kept away from the Blue Goose for about five months, but that after Jake Roberson and Gene Roberson sold the cafe to Kenneth Langston around February 12, 1947, *and the new purchaser had made arrangements*

*with her to return to the Blue Goose and work for him, to begin on Tuesday.* Doc Wilson was then working at Spavinaw, but he returned to Fairland the evening of Saturday, February 22, and about 7 o'clock she met him at the Cozy Cafe and they each drank a cup of coffee and then went to the Blue Goose to talk to Kenneth Langston about the job. When they entered they found Gene Roberson attending bar, and Jake Roberson was also in the cafe. The Wilsons ordered a bottle of beer and a few minutes later the Robersons left, and then Langston came over and conversed with Doc Wilson, and Wilson left the cafe by the back door.

Jake Roberson testified that he and his son went for supper and then returned in 20 or 25 minutes and that Gene went to work tending bar, and that he just visited around near the cigar case near the center of the room. That he was armed with his gun before he first saw Wilson, and had been carrying a gun for a long time. He saw Doc Wilson's wife in a booth and Vearl Hopkins. was sitting with her. Later he saw Doc Wilson in the booth, and also another man that he did not recognize at. the time; that they were in the second booth from the east or front end of the building; that Doc Wilson and his wife were facing west, Doc on the outside; that defendant stayed in the back end of the building about an hour or hour and a half before the shooting occurred; that "Shine" Hopkins, Henry Schubert, Henry's little .boy and Jess Goins were there talking with him near the cigar case.

There were four booths along the north side of the building, commencing from the east, or front, and the building was about 60 feet long, with the front door on the east end, with a coke box and beer box and bar counter along the south side in order from the east. The cigar

case was west of the bar. There was a partition about 15 feet in from the west end of the building and a counter and stools in the center west end, but no food was served there. To the west of the booths was a juke box, marble machine and stove.

As heretofore stated, defendant testified that when one Franklin McGinnis called his attention to the fact that Doc Wilson was in booth two that he suggested to McGinnis: "Why don't you go up there and tell Wilson to leave, I don't want no trouble." The evidence shows that as McGinnis moved away from booth two towards the ice boxes a shot was fired. Of all the witnesses present, only the defendant, his son Gene, and Jack Blalock would testify that Doc Wilson had a gun and shot at Jake Roberson, and Blalock was impeached by the testimony of John Jones, Wanda Jones, Bessie Black and Betty Cox, who testified that right after the shooting Jack Blalock came to John Jones' home and in the presence of said persons, when asked by Jones: "Did Jake kill Doc in cold blooded murder?" Blalock answered: I guess he did, Doc did not have a gun." Jones also stated that he returned to town with Blalock and he repeated the statement. It appears that Blalock was related to some of these witnesses and also that Jones' brother, Paul Jones, died from gunshot wounds that he received during the trouble between the defendant and Doc Wilson in the Blue Goose beer parlor.

The defendant testified that just as he was getting ready to go home and had taken a step or so from the cigar counter that he saw Doc Wilson stand up in the booth with a pistol in his hand and levelled at him, that Doc fired and the bullet hit defendant in the back of the neck, the defendant ducked and moved a couple of steps over, grabbed his gun from his belt and shot at Wilson

two or three times, and that Wilson ran over to the bar and got behind somebody, later found to be Paul Jones, held Jones with one hand and kept the pistol pointed at defendant and defendant walked over to a booth, stopped and stood there, that Wilson came from behind Jones and shot at defendant the second time some six feet away, and defendant shot back twice; that Wilson's gun fell to the floor, Wilson lunged at defendant, knocking defendant down and fell on defendant's lap; that Gene Roberson and Langston came over and defendant gave his gun to Langston, and then went with his brother and son to get his neck wound dressed, could not locate a doctor and went to the home of Minnie Roberson and got a Dr Stacy to come and dress two wounds in the back of his neck. Dr. Stacy did not testify, but Dr. Letcher of Miami at the trial testified that he had examined the two wounds the day after the shooting, which were about an inch apart and that in his opinion they were bullet wounds, or fragments thereof.

The officers and others failed to find any signs of bullets in the walls or furniture back of where defendant was standing, but did find bullet marks at points east of where the defendant stood; Sheriff Allemann testified that he searched all walls, ceilings, floors, fixtures, and found where a bullet had struck the first booth in front and knocked a sliver of wood off about eight inches from the floor; that he found a bullet on the floor between the booths and the bar, found one on the edge of the ceiling over the second booth, that he pried the bullet out, and found a bullet mark in the wall at the third booth. Every bullet from defendant's gun was accounted for.

Dr. W. G. Chesnut testified that he examined the body of Ben or "Doc" Wilson on the night of February

22, 1947, after the shooting and that he had a wound on the right ring-finger, that the same bullet entered the body through the third rib of the right part of the chest three inches from the nipple toward the shoulder, that it ranged downward and that Wilson died from this wound.

Jess Goins testified that he was looking at Doc Wilson when he arose in the booth; Jess was standing near Jake Roberson and a little behind; Goins stated that Wilson did not have his arms raised and that he did not see any gun in his hands, that Doc took a step or so toward the bar which was across the aisle south, and he did not see Jake until the shooting started, and he saw Jake with his gun shooting toward the front of the building and at Wilson, that Wilson got behind a man but Jake shot and hit that man; that Wilson came out and grabbed Jake and they went to the floor and Goins came around from between the bar and cigar case and Wilson was lying on his face and that he saw no gun in his hands or on the floor; that he laid Wilson on his back; that so far as he knew Jake was the only man that did any shooting. Defendant's counsel introduced the statement that Goins signed in which it was stated that he could not tell who was doing the shooting.

Jack Stoffer swore that he saw Doc Wilson on the floor after the shooting and saw somebody slip something under him. On cross-examination he could not say who slipped the something under Wilson, and his testimony was very indefinite. He was in the third booth and a bullet went through his sack of eggs that was on the table of the booth.

The shooting happened about 9:30 or 10:30 at night and the evidence is undisputed that when Wilson's body was raised for removal a .38 calibre nickel-plated black-handled pistol was found under him, about two-thirds

of the way from his hip to his knee; that the assistant county attorney, Beauchamp. picked up the gun. A piece from the handle was found five or six feet away. The gun was later given to Sheriff Allemann.

The evidence showed that the gun belonged to Vearl Hopkins, a friend of the Wilsons, and Hopkins claimed that someone stole the gun out of his car about a month prior to the shooting and that he reported this to Dewey Hallam, town marshal; that prior to that Gene Roberson had borrowed the gun from him and kept it in the cafe for about a month. Gene Roberson denied borrowing the gun, but testified that Hopkins asked him to keep it for him three or three and a half weeks prior to the shooting and he kept it for only four or five days; that Hopkins got the pistol and borrowed six blunt-nose shells from him about nine or 10 days before the shooting; that the next time he saw the gun was when Doc Wilson was lifted from the floor, and that it had two empty shells and three loaded snub-nose shells in it. When Dewey Hallam testified for defendant, it was not sought to impeach Hopkins' testimony on this point.

Sheriff Allemann identified five shells that were taken from the gun found under Wilson; two were exploded and one unexploded shell was a snub-nose and two were standard shells.

Charley B. Earls testified that he talked to deceased just prior to the shooting and while he was sitting in the second booth, and that if he was intoxicated he could not tell it; that he had just stepped out of the cafe when the shooting started, but came back in; that he never saw a gun in Doc Wilson's hand, but did see one in Jake Roberson's hand and saw Doc Wilson grip Jake's arm, but did not actually see the shooting.

Ben Grigsby testified that Wilson was sober, though the undisputed evidence showed that Wilson had consumed a number of beers. Grigsby further testified that he saw Wilson arise from the booth and take a step or so toward the bar, that he could see his hands and that he never had a gun; that he did not see the shooting, just heard it; he did not know who did the shooting.

Henry Schubert did not see any guns, just heard the shots, thought the first shot came from the front toward Roberson; that he left quickly.

There were a number of witnesses who testified to fist fights in which Doc Wilson had been involved, and his readiness to fight when drinking. Jess Pennington, former city marshal of Fairland, had a couple of fights with Doc Wilson when arresting him for disturbances, and one time at a dance he was jerked into a dimly lighted room and beaten up with brass knucks, and he learned afterwards that Doc Wilson used them.

*The defendant argues that the verdict of the jury was the result of passion and prejudice created through the introduction of prejudicial, improper and incompetent evidence, and under this contention argues under four subdivisions, as follows:* [That]

(1) "It was error to permit an attack on defendant's reputation and character for turbulence and violence when defendant had not offered a word of evidence as to his reputation and character, nor put it in issue in any way."

(2) "It was reversible error to permit the introduction of evidence as to other crimes which defendant was supposed to have committed."

(3) "It was error to permit inquiry on cross-examination as to specific acts of violence and turbulence."

(4) "It was error to permit the County Attorney to make repeated inquiry of defendant as to specific acts

of violence and threats to kill deceased, and then offer no proof whatever that such acts of violence were committed and such threats made."

This brings us to a consideration of a line of questioning by counsel for both the defendant and the state, and not summarized above.

I have read the entire record several times, and do not find material error until the defendant took the witness stand and was allowed to be questioned by his counsel, not only as to his having heard of other difficulties in which deceased had been engaged, which was competent, but entered into details of such difficulties, which was error. Also, defendant produced a number of witnesses who testified as to personal fights with the deceased, or having heard of deceased having fights with other persons. And a number of witnesses for defendant, contrary to law, were permitted to testify to the details of difficulties which they had with the deceased as far back as 1943. Many of these were incidents not definitely shown to have come to the knowledge of the defendant prior to the homicide, being difficulties involving the deceased and other persons.

Defendant testified that he had heard of Doc Wilson and Jess Pennington having one fight, but Jess Pennington testified about two fights with the deceased, and he went into details, setting out in the first fight that Wilson was resisting arrest and that he hit Wilson over the head with his pistol and it went off and Pennington got shot in the leg, and then had a fist fight with Wilson, subduing him. That later at a birthday dance at Jim May's, Doc Wilson beat witness Pennington with brass knucks. Pennington went into details of this fight. The record is silent as to which of these fights the defendant

had heard of, and whether or not before or after the homicide.

Sam Laswell, once county jailer, testified to Doc Wilson, three or four years prior to the trial, coming to the sheriff's office one night and that he was drunk, loud and boisterous. There was no evidence that this ever came to defendant's notice. It was further attempted to show by the witness that the deceased made threats to whip someone, but the witness did not so testify. The tactics of the prosecution in cross-examination, detailed in the majority opinion were no worse than the tactics of the attorneys for the defense in their examination. They were all trying to "win." It is well settled that specific uncommunicated acts of violence of deceased are inadmissible, and that while defendant may be permitted to testify that he had heard of difficulties in which deceased was involved, the fact that those difficulties actually occurred or the details thereof may not be established. See Brock v. State, 55 Okla. Cr. 410, 32 P. 2d 88; and in Short v. State, 74 Okla. Cr. 272, 125 P. 2d 227, citing Elliott v. State, 18 Okla. Cr. 230, 194 P. 267, the court said:

"Where, in a homicide case, self-defense is pleaded, and there is evidence to support same, specific acts of violence on the part of the deceased may, if known to the defendant prior to the homicide, be shown in evidence."

I would here stress the proper method of proving general reputation. When a witness is put on the stand to attack or defend character, he can only be asked, on the examination in chief, as to the general reputation of the person whose character is in question, and he will not be permitted to testify to particular facts either favorable or unfavorable to such person, *but when the witness is subject to cross-examination, he may be then asked, with*

*a view to test the value of his testimony, as to particular facts.*

So, then, there was serious error here brought about by the defendant and in his favor. So that on cross-examination the county attorney under the situation, questioned defendant concerning his carrying a gun, which he admitted he had done for years, while he operated the cafe, and had continued to do since, questioned him concerning shooting near deceased's home and yelling for deceased to come out, and questioned defendant concerning other alleged acts of violence,—such examination following the pattern introduced by counsel for defendant in his examination of defendant and defendant's witnesses who sought to show the character of the deceased for violence and turbulence. We do not deem this prejudicial error on the part of the state for reasons hereinafter detailed.

The state did not qualify and offer witnesses for the purpose of showing the character of the defendant in the community in which he lived for being a quarrelsome and turbulent person, nor to show specific acts of violence on the part of the defendant of which the deceased had knowledge. The propensity of the defendant for violence and turbulence was only inferentially brought to the attention of the jury and strictly by cross-examination, except the testimony of Elaine Wilson as to difficulties between deceased and defendant, and her testimony, unobjected to, that when she worked for defendant, that she had seen him lots of times when he was drinking get his gun; and the testimony of Tobe Wilson, a rebuttal witness, concerning the defendant shooting near deceased's home, which was competent by reason of the rule affirmed in Tallon v. State, 22 Okla. Cr. 89, 210 P. 309, and Jackson v. State, 84 Okla. Cr. 138, 179 P. 2d 924, and being:

"Evidence of the actions, conduct, and general demeanor of defendant a short time prior to the commission of the homicide is competent as tending to show the state of mind of defendant at the time of the killing."

The questions asked on cross-examination of the accused by counsel for the state were permitted by the court for the reason, as stated by the court:

"The defendant has opened up the question by testimony showing the general reputation of deceased for violence and turbulence, and had further testified concerning specific acts of violence committed by the deceased which were within the knowledge of the defendant."

In Porter v. State, 1912, 8 Okla. Cr. 64, 126 P. 699, this court, in syllabus prepared by the court, adhered to the general rule that we have heretofore mentioned, stating:

"Where the character or reputation of the accused is not an element of the crime charged, the prosecution cannot put it in issue by offering evidence of his bad character, unless the defendant first offers evidence of his good character. The prosecution may then rebut it by evidence of bad character."

However, Judge Furman in the body of the opinion did make the statement:

"The fact that appellant placed in issue the general reputation of the deceased as to his being a dangerous man did not place the character of appellant for peace in issue."

It seems that the nature of the cross-examination tended to show that defendant was an all-around bad man and a horse thief. I have no fault to find with this case. The exception that the state contends for would not sanction all of the questions asked on cross-examination in the Porter case, and might not sanction any. There are not enough facts set forth to say. The expression

might have been dicta. It would depend on whether or not self-defense had been pleaded and there was doubt as to who was the probable aggressor. So, Porter v. State, supra, can only be said to support the general rule that until the accused introduces evidence of his good character, the state may not introduce evidence of his bad character. And, as stated, I find no fault with this rule. I do not find, however, where the question at issue herein has ever been squarely before this court and the reasons for the exception sought considered.

Therefore, by reason of the treatment of the question on trial by the court and the attorneys for both the defendant and the state, and then on appeal by the attorneys, the writer of this dissent deems it necessary to determine not only the correctness of the cross-examination allowed, but also the admissibility as substantive evidence of the factual situation thus attempted inferentially.

If evidence of the character of the defendant for turbulence and violence would be competent on behalf of the state, then the error in permitting the question on cross-examination of defendant's witnesses as to specific acts of violence of defendant not shown to have been within the knowledge of the deceased was overcome by failure to show that the violent acts of deceased of which he had heard, came to his knowledge prior to the homicide, and heretofore pointed out.

This court in Radney v. State, 36 Okla. Cr. 240, 253 P. 913, 917, held:

"The rule is well settled that, ordinarily, a party may not complain of an error which he himself has invited, or which he has waived, either expressly or impliedly. This rule clearly applies to a case where one party resorts to incompetent evidence without objections, and where the opposite party replies with evidence of the

same character. In such case, both [parties] are at fault and neither can complain in this court of the admission of exclusion of the evidence by the court below." (1 Wig. Ev. 2nd Ed. par. 15 is cited.)

See, also, Creek v. State, 16 Okla. Cr. 492, 184 P. 917, holding:

"The cross-examination of a witness is not to be confined to the particular questions asked, nor the precise subjects called to his attention, on direct examination. The correct rule is to allow the cross-examination to extend to any matter not foreign to the subject-matter of the examination in chief, which tends to limit, explain, or modify the same."

If the deceased arose in booth two of the Blue Goose beer parlor and fired at defendant, then defendant, not being able to avoid the conflict or protect himself otherwise, had a right to fire back at the deceased in his necessary self-defense. But even if deceased was armed or not in fact armed, unless he made some overt act toward using his gun, or caused defendant to think that he was attempting to fire on him, the defendant would not be justified in firing on the deceased, and to do so and kill his opponent would constitute murder. See: Jenkins v. State, 80 Okla. Cr. 328, 161 P. 2d 90, 162 P. 2d 336; Young v. State, 11 Okla. Cr. 22, 141 P. 285.

At trial, *the vital question for the determination by the jury was whether the deceased was the aggressor or whether the defendant was the aggressor.*

For a clear understanding of the question and implications, let us first consider the settled rules of law in this jurisdiction as such rules apply to the defendant.

It was important for the defense to know something of the character of the deceased for being a quiet and peaceable citizen, or for being a quarrelsome, violent and

turbulent person, as one's persuasion will be more or less affected by such traits of character, and such evidence might throw light on the probabilities of the deceased's action. The general rule is that character and reputation may not be proven by specific acts, but must be proven by one's general reputation in the community where he resides for the traits of character in question. The general reputation, then, of the deceased for violence and turbulence, was admissible in this case, whether known by the defendant or not, *but is received for the sole purpose of showing what the deceased probably did, and not what the defendant probably thought the deceased was going to do.* The inquiry is one of objective occurrence, not of subjective belief. See: Wigmore on Evidence, 3rd Ed., par. 63, which is cited with approval by this court in Mulkey v. State, 1911, 5 Okla. Cr. 75, 113 P. 532.

It is also important, in order for defendant to show the reasonableness of his apprehension of violence for deceased to show violent acts of the deceased, if any, of which he may have had knowledge prior to the difficulty. See: Sweet v. State, supra; Mathews v. State, 16 Okla. Cr. 466, 184 P. 468; Elliott v. State, supra.

In the first above case, this court, by Jones, J., said [70 Okla. Cr. 443, 107 P. 2d 823]:

"The knowledge of the defendant derived from such personal observation, as well as otherwise, of the violent temper of the deceased and his liability to attack persons without cause, is a most important circumstance in determining from the standpoint of the accused the reasonableness of the danger apprehended by him, and from which the defendant might estimate the conduct of the deceased, the character of the attack made upon him, and what he might expect from his assailant as well as that which he might at the moment deem necessary to guard

himself against." Sneed v. Territory of Oklahoma, 16 Okla. 641, 86 P. 70, 8 Ann. Cas. 354 was cited.

The court also quoted from Mulkey v. State, supra, as follows:

"As a general rule, the evidence of the character of the deceased must be confined to his general reputation, and evidence of particular acts of violence is inadmissible unless they were directly connected with that involved in the homicide. * * * But, under the facts which the evidence here tends to prove, these prior assaults and acts of violence, being known to the defendant, were important circumstances in determining from the standpoint of the defendant the reasonableness of the danger apprehended by him * * *."

Mulkey v. State, supra, has also been quoted with approval in the case of Edwards v. State, 58 Okla. Cr. 15, 48 P. 2d 1087.

A late case from another jurisdiction approving the above principle of law, with clear discussion, and citing Sneed v. Territory, supra, is Jones v. State, 182 Md. 653, 35 A. 2d 916.

In the within case there was evidence of threats made by deceased against defendant and of threats made by defendant against deceased. This court in Saunders v. State, 4 Okla. Cr. 264, 111 P. 965, 966, Ann Cas. 1912B, 766, said:

"On a trial for murder, where the plea is self-defense, and where there is some evidence other than threats tending to support the plea, proof of threats, communicated and uncommunicated, is admissible; the latter as a circumstance to be considered in connection with all other evidence in the case in determining the state of deceased's feeling toward the defendant and who was the probable aggressor in the fatal difficulty, and for no other purpose; the former, not only for that purpose, but

also as a circumstance in determining what the defendant might reasonably have apprehended from the overt acts and demonstrations of the deceased, if he made any, at the time of the fatal difficulty."

See, also, 1 Wigmore on Evidence, 3rd Ed., pars. 110, 111, and Jenkins v. State, supra.

The distinction between communicated and uncommunicated threats rests on the same principle as that between character used to show the probability of the deceased's act, and communicated reputation to show defendant's apprehension. 1 Wigmore on Evidence, par. 111, Mulkey v. State, supra.

But the good character of the deceased may not be made subject of proof by the state until attacked by the defendant. Miller v. State, 63 Okla. Cr. 64, 72 P. 2d 520. Thus it is found that the defendant and not the state has the election of opening up this field of inquiry. Many jurisdictions hold otherwise, but this is the rule in Oklahoma.

Likewise, it is a fundamental principle of criminal law that the character of the defendant cannot be impeached or attacked by the state, unless he puts his character in issue by introducing evidence of good character. See Miller v. State, supra; and Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809. The majority opinion cites thirty-one authorities so holding.

There can be no doubt that such is the law in Oklahoma; but see also Kirk v. State, 11 Okla. Cr. 203, 145 P. 307, where the court says:

"A defendant, by availing himself of the statutory privilege of becoming a witness in his own behalf, has voluntarily changed his status from defendant to witness, and consequently may be cross-examined within the

usual boundaries, and thus be discredited and impeach-
ed."

So, after the defense attacks the character of the
deceased, this may be rebutted in introduction of evidence
showing the deceased's reputation as a peaceable citizen.

But that is only half the matter, and in my opinion
courts and members of juries cannot help but feel so, as
any mind in search of truth, and finding itself in doubt,
would want to know something of the propensity of the
accused for being quarrelsome and turbulent. A trite but
expressive phrase is applicable: "What is sauce for the
goose is sauce for the gander." Such evidence as against
the deceased is, as we have seen, admitted purely to aid
the jury in determining the question as to who was the
probable aggressor. Then in the interest of fairness and
justice, having at the election of defendant gone half way,
why should we not go the whole way and admit evidence,
not of the moral character of the defendant, nor his rep-
utation for truth and veracity, nor his past record for
crime in general, to be sure, but permit inquiry into the
same limited traits of character defendant seeks to probe
into concerning the deceased? The fairness of such a
rule is apparent. And while a search of the authorities
surprisingly discloses few cases where this question has
been clearly and fully treated, and fewer where adopt-
ed, it is as "the voice of one crying in the wilderness,"
and the justice and wisdom of the principle is most ap-
pealing and persuasive.

The majority opinion quotes from the six-volume
and remarkable work and recognized authority, Wigmore
on Evidence, Vol. 1, Sections 57 and 194, and quotes also
from page 650, all involving reasons for the general
rule. However, a careful perusal of this work reveals
that the author had something to say concerning the ex-

ception to the rule that the majority opinion has label-ed the "Missouri rule." Said he at page 472, under Sec. 63 of Vol. 1 of Wigmore on Evidence:

"Moreover, if the deceased's character for peaceable-ness has thus been introduced by the defendant, the same principle would then justify the prosecution (plain-tiff) in introducing the *defendant's character* for violence, by way of exception to the rule of Sec. 57, ante." [That defendant's bad character may not be offered against him until he introduces evidence of his good character.]

Thus Wigmore advocates an exception to the rule that he establishes in the quotations from his work and set out in the majority opinion.

One of the most interesting discussions of the prob-lem now before this court is contained in an opinion by Chief Justice Thomas, in Strong v. Commonwealth, 1926, 216 Ky. 98, 287 S.W. 235, 237, and though the court did not see fit to overrule its former decisions, nec-essary for the adoption of the rule, nevertheless the case presents a strong argument for the rule that is being con-sidered. Said the court:

"In the absence of a statutory rule to the contrary, three traits of character, provable by general reputation, may be investigated as affecting the main issue in litiga-tion; but such testimony is more frequently introduced in rebuttal to affect the credibility of a witness or a party if he has testified as a witness than as substantive testimony. Those three traits which may be proved by general reputation are: (1) For truth and veracity; (2) for morality; and (3) for peace and quietude. And it is the failure of text-writers and courts, in their forma-tion of the correct rule of practice, to distinguish be-tween the three that has produced some confusion and also produced what clearly appears to be an illogical position in denying the introduction of substantive tes-timony on the third trait by the prosecution to prove the

bad reputation for peace and quietude of the defendant
when the nature of the issue being investigated involves
it. It is the universal law that testimony to prove traits
Nos. (1) and (2) may never be introduced by the com-
monwealth as substantive testimony. It is equally well
settled that the character involved in the third classifi-
cation may not be introduced to impeach the credibility
of a witness, including a defendant testifying for himself
in a criminal prosecution, since those traits of character
have no bearing on the truthfulness or the veracity of
the witness. * * *

"If, therefore, such character evidence [as to peace
and quietude] as to the deceased is thus made competent
as substantive testimony on behalf of defendant for the
purpose of showing (in the character of cases to which it
applies) who was the aggressor in the difficulty, it would
seem to follow that the same character of testimony as
to the general reputation of the defendant would likewise
throw light on the same issue, and the courts of Alabama
and Arkansas so held in the cases of Cook v. State, 5 Ala.
App. 11, 59 So. 519, and Carr v. State, 147 Ark. 524, 227
S.W. 776. We, however, have been unable to find any
text-writer on criminal law adopting the rule as so an-
nounced by the courts of those states; nor has this court
done so in any opinion that we have been able to find.
[Since this opinion, Wigmore, Vol. 1, § 63, 3rd Ed. has
come out for the rule, and Missouri has adopted the
rule.] The reason for rejecting it seems to be that the
deceased is not on trial and the jury cannot be led astray
so as to do him harm by the introduction of the testi-
mony as to his character; but to admit its introduction
as against the defendant on trial would possibly result
in miscarriages of justice by inducing the jury to con-
vict him because of his general bad reputation for peace
and quietude rather than because of his guilt of the of-
fense on trial. * * *"

In Connecticut, different from Oklahoma and many
of the states, the defendant may not, where the issue of
self-defense is made in the trial for homicide, and thus
a controversy arises whether the deceased was the ag-

gressor, show the character of the deceased to throw light on the probabilities of the deceased's action, because the Supreme Court of that state in State v. Padula, 106 Conn. 454, 138 A. 456, 458, holds such evidence inadmissible chiefly on the ground that "logically [the use of such evidence is], as applicable to the accused as to the deceased." But this court is under no such inhibition for such particular reason, because of the rule in Miller v. State, supra. Prof. Wigmore's further comment at page 468, Vol. 7, Wigmore on Evidence, is:

"* * * but why not let it be offered, on the principle that the accused has invoked the issue? Certainly, in lay experience, these two terms of evidence are always looked for."

Also in Tingley v. State, 16 Okla. Cr. 639, 184 P. 599, this court in a measure recognized the principle here involved when it upheld the right of the state, after the defendant introduced evidence to show improper relationships between the deceased and defendant's wife, to prove that the defendant had been involved with a woman of bad character.

Also in the case of O'Neal v. State, 55 Okla. Cr. 388, 31 P. 2d 886, 887, a case where defendant was charged with murder, and being a case where the defendant did not place his general reputation in issue by attempting to show his good character, the court said:

"Defendant next contends the prosecution persistently attempted to introduce evidence of bad reputation of defendant when he had not put his reputation in issue. This assignment is directed to various questions touching defendant's conduct on the evening of the homicide as tending to show ill will toward the negro porters at the hotel and that he was in a bellicose state of mind. Certainly the state cannot attack the reputation of a defendant in the first instance, and evidence of reputation

is admissible on the part of the state only after a defendant has introduced evidence on this point. Whitlow v. State, 24 Okla. Cr. 307, 218 P. 162. The questions propounded and the evidence introduced and sought to be introduced here complained of do not constitute an attack on defendant's reputation. They are directed rather to matters connected with the homicide and tending to throw light upon the motives and intent of defendant and to refute the plea of self-defense. There is no material error on this point."

The court then cites with approval the case of Williams v. State, 4 Okla. Cr. 523, 114 P. 1114.

In New York upon a trial for murder, the accused, after giving evidence tending to show that he acted in self-defense, may prove that the general reputation of the deceased was that of a quarrelsome, vindictive, or violent person, and that such reputation had come to defendant's knowledge prior to the homicide, but such evidence is not received to show that the deceased was the aggressor, for, said the court:

"If competent for that purpose, similar evidence could be given as to the reputation of the defendant, as bearing on the probability that he was the aggressor."

People v. Rodawald, 177 N.Y. 408, 70 N.E. 1, 5. But in Oklahoma it is received to show that deceased was the aggressor.

See: People's Loan & Inv. Co. v. Travellers Ins. Co., 8 Cir., 151 F. 2d 437, citing Carr v. State, 147 Ark. 524, 227 S.W. 776, announcing the Arkansas rule to be:

"The Arkansas rule is that where a question of self-defense is involved, the reputation of each party to the encounter for peace and quietude is admissible as tending to show which one was the probable aggressor, but the party offering such evidence is restricted to proof of general reputation and cannot introduce specific in-

stances of conduct, and such rule applies to a civil action arising out of the encounter as well as to a criminal prosecution."

The Attorney General has called attention to the case of State v. Robinson, 1939, 344 Mo. 1094, 130 S.W. 2d 530, where the question involved has been well treated. It is well to keep in mind that in Missouri the proof of deceased's reputation for being a dangerous, quarrelsome and turbulent person *is restricted to establishing general reputation for such traits in the community in which he was known, and such character may not be proven by evidence of specific acts of violence having no connection with or relation to defendant.* State v. Naylor, 1931, 328 Mo. 335, 40 S.W. 2d 1085. In other words, in Missouri the inquiry is made to show what the deceased probably did, and not what the defendant thought he would do, and is admissible without reference to whether it came to the knowledge of defendant or not. But, in addition, in Oklahoma, as has been set out, in proper case, specific acts of violence on the part of the deceased may, if known to the defendant prior to the homicide, be shown in evidence, but is received to show the probable state of mind of the accused produced by the knowledge of deceased's violent and dangerous character, rather than for the purpose of showing what deceased probably did.

Nevertheless, in State v. Robinson, supra, the court said:

"We need not discuss the historical development of the law or in what circumstances testimony with respect to traits of character is admissible. The character of the accused may become involved in two aspects. If he testifies, he may be impeached for truth and veracity the same as other witnesses. * * * His reputation with respect to the essential traits of character involved in the offense for which he is on trial is always relevant as

an aid in demonstrating his innocence; otherwise testimony establishing his good (as well as his bad) reputation with respect thereto would be inadmissible. But to preclude a possibility of unjust condemnation, the bad character of an accused, generally speaking, may not be made the subject matter of inquiry upon the trial until he tenders an issue involving his character. Of course, appellant's attack upon the character of deceased did not go to discredit deceased as a witness. Its purpose was to *evidence the probability as to who was the aggressor* and to substantiate appellant's plea of self-defense. * * * The same reasoning which allows an accused to show his victim's bad reputation underlies the admissibility of the accused's bad reputation. An accused is entitled to a fair trial. So, too, is the State, representing the victim and all citizens, that crime may be curbed. It will not do to say that only a part of the evidence bearing upon an issue admissible. *Impartial justice cannot be dispensed by allowing one litigant to present a given type of evidence bearing upon an ultimate factual issue while at the same time denying to his adversary the right to present his version of said issue by evidence of equal inherent quality.* State v. Jones, 14 Mo. App. 588, 589, states: '(4.) The character of the accused for violence may be inquired into *where the homicide occurs under circumstances which render it doubtful whether the act was committed in self-defense under a well grounded apprehension of immediate danger,* but his character generally may not be investigated.' Upon appeal, this court en banc (79 Mo. 441) affirmed the judgment of the Court of Appeals, stating 79 Mo. loc. cit. 446: '* * * we find no reversible error in the record * * *'; although point '(4)' was not specifically discussed. We do not place the instant ruling upon the broad ground stated in State v. Jones, supra. We here hold that where an accused tenders the factual issue of the bad character of the victim of his assault to substantiate his plea of self-defense he thereby extends the scope of the inquiry beyond the res gestae and opens up for inquiry all evidence of like quality having probative value on the merits of said

ultimate factual issue. * * *"  [Italics mine.]  [344 Mo. 1094, 130 S.W. 2d 531].

The reasons for the rule announced by the Missouri court above, and as elsewhere stated herein, are most compelling, and especially so in this jurisdiction in view of the rules we have adopted in favor of the defendant as set out in Mulkey v. State, Brock v. State, Saunders v. State, and Sweet v. State, hereinbefore quoted.

I therefore feel that it was not error for the county attorney to attempt to show inferentially by his cross-examination complained of, the defendant's propensity for turbulence and violence.  And, in addition to the reasons heretofore given supporting the admissibility of the evidence of Elaine Wilson and Tobe Wilson concerning acts of turbulence on the part of defendant towards the deceased and near deceased's home, which the record indicates was within the knowledge of the deceased, I feel such evidence competent for the reasons immediately hereinabove given.  I feel that in a homicide case where the plea of self-defense has been interposed, and there is doubt as to who was the aggressor, and predicated on defendant first offering evidence of the deceased's reputation as to having been a violent, quarrelsome and turbulent person, the state may show the reputation of the accused for the same traits of character by showing his general reputation in the community in which he lives for such traits, or in view of the rule in favor of defendant set out in Sweet v. State, supra, by showing specific incidents if it can be shown that the deceased had knowledge of such incidents, and providing that defendant sought to show specific incidents of which he had knowledge prior to the homicide.

I would emphasize that only the defendant has the key to the door.  He may, if he chooses, keep it closed.

Only when he elects to open up the subject of the reputation of the deceased for violence and turbulence may like inquiry be made as to himself. Should the defendant be a person with a reputation in the community where he lives for being a quiet and peaceable citizen, and the deceased be noted for his violence and turbulence, no doubt the door would be opened. But should the facts be reversed, one might expect the defendant to carefully avoid this field of inquiry. The initiative is with the defendant, which is an asset in any contest, and still clothes him with advantages over the state; that is, if he had a past so fraught with violence as to create the possibility that he would be seriously prejudiced in the eyes of the jury and not receive a fair trial, he can by-pass the subject.

There were instances where the county attorney failed to offer further proof of the violent acts about which defendant was cross-examined. And counsel for defendant was cross-examined. And counsel for defendant complain about this, indicating that the state, to show good faith, should have offered further proof. This contention, of course, presupposed the admissibility of such evidence in the first instance. And if such evidence had been offered it would have been necessary to have known that deceased had knowledge of the specific instances of violence sought to be shown—probably an impossible burden in most instances. Due to the already great length of this opinion, I shall not detail the cross-examination complained of, and that has been done in the majority opinion. Suffice to say, there appeared to be doubt as to the correct rule of law to follow in the admission of this line of evidence. This was a hotly contested case, where over 30 witnesses testified. The attorneys on both sides argued the question of the admissibility of the evi-

dence out of the presence of the jury, awaiting rulings of the court, and all their actions appear to have been in the best of faith, though each was vigorously representing his side.

This court held in the case of Jackson v. State, 67 Okla. Cr. 422, 94 P. 2d 851:

"When a defendant takes the witness stand he is subject to cross-examination by the same rules that govern other witnesses. If asked if he did not make some specific statement to a certain individual and he denies it, the state should, if available produce the party to whom the statement was made. In the absence of bad faith this is not necessarily reversible error."

This case is cited with approval in Allen v. State, 72 Okla. Cr. 102, 113 P. 2d 835:

From the state of the record there is another reason why the effort of the state to show by cross-examination the bad character of the defendant for turbulence and violence, as heretofore detailed, does not constitute prejudicial error, and that is: concerning the specific acts of violence allegedly committed by defendant, in each instance over objection of counsel for defendant as to the competency of the testimony, the defendant's answer was, "No, sir." There was no attempt on the part of the state to show that the specific acts of alleged violence on the part of the defendant with other persons, inferred from the nature of the cross-examination, were within the knowledge of the deceased, and the state did not attempt to show the general reputation of the defendant for turbulence and violence in the community in which he lived. There is no proof in the record that such acts were committed by the accused. In determining whether or not the admission of any evidence constitutes reversible error, the whole record must be considered, and in viewing this

entire record together with the verdict of the jury, it is apparent that the erroneous admission of the questions asked on cross-examination did not constitute reversible error.

See Tit. 22 O.S.A. § 1068; also Kennamer v. State, 59 Okla. Cr. 146, 57 P. 2d 646, and Tingley v. State, supra, holding:

"This court will not reverse a judgment of conviction on the ground of the improper admission of evidence unless it appears, after an examination of the entire record, that in the opinion of the court the error complained of has resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

I do not feel that the testimony of Sheriff Allemann and Kenneth Langston concerning the alleged changes in location of articles or things in the cafe following the shooting, ? ᾽ any bearing on the issues in the case, and was a waste of time so far as shedding any light on the crime. I cannot see where this helped the state, or hurt the defendant.

The final complaint by defendant is that the trial court erred in overruling his motion for new trial, because the evidence is insufficient to support the judgment of conviction.

To my summary of the evidence heretofore recited, I might add that whether defendant feared the deceased, and was justified in believing that the deceased might attack him with firearms, the jury had an opportunity of judging from the defendant's own testimony. Defendant was asked on direct examination, and answered, as follows:

"Q. Do you know whether Doc Wilson had fights and difficulties with other persons? A. Yes, sir. Q. Do you

know what his general reputation was in that community around Fairland with respect to being a quarrelsome, fighting, turbulent person?  A. Yes, sir, I knowed something about it.  Q. What was that reputation, good or bad?  A. Well, it was pretty rough."

On cross-examination he was asked, and answered as follows:

"Q. Did you ever know of Doc Wilson having a knife or gun in a fight?  A. Yes, sir.  Q. When was that?  A. I know he had that gun the 22nd of February.  Q. I mean any other time than that time you claim he had it at Fairland; did you ever hear of him using a knife, gun, club or weapon in a fight?  A. No, sir, I don't think so. * * * Q. Any of these fights Doc Wilson had, you don't know who started them?  A. I know who started it with me.  Q. I am talking about these other fights you claim you hear about him having, you don't know who started those fights, do you?  A. No, I don't really know, no."

There were a number of remarkable matters the jury had to meditate on: The absence of bullet marks on the south or back end of the Blue Goose beer parlor; how Wilson could shoot Roberson so as to graze the back of his neck when they apparently faced each other, shooting one bullet from the booth a distance of around fifteen feet, and the second time, according to Roberson, on stepping out from behind Paul Jones, at a range of six or seven feet, and the bullet again grazing the back of defendant's neck only one inch from the other wound; why the physician who dressed the wound the night of the difficulty did not testify to throw further light on this wound; and why no more people than the defendant, his son, and Jack Blalock who was impeached, were able to see a gun in Wilson's hand; and, finally, why neither the prosecution nor the defense inquired of Kenneth Langston, owner of the Blue Goose, about the facts of the shooting when he, from the evidence, had every opportunity to

view every move of the defendant and the deceased. These matters were mysteries.

Though there was conflict and contradictions, and much left to conjecture concerning some points, nevertheless there is ample evidence in the record to support the verdict of the jury and judgment of the court based thereon. See the recent case of Osborn v. State, 86 Okla. Cr. 259, 194 P. 2d 176, 177, Jones, J., holding:

"Conviction in a murder case will not be reversed on appeal as not sustained by the evidence unless there is no substantial evidence tending to show that guilt of the defendant, or unless it fails so far to support the verdict that the necessary inference is that the jury acted from partiality or prejudice, or was controlled by undue influence."

No substantial error appearing, I respectfully dissent.